[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I
The plaintiff and the defendant were married on January 12, 1980 at Wallingford, Connecticut. This is the second marriage for both parties.
Joseph R. Christoni's date of birth is December 17, 1906, and Janina Christoni's date of birth is January 31, 1929. The parties both have families from prior marriages.
The plaintiff alleges in his amended complaint that the marriage has broken down irretrievably. The plaintiff also alleges in his amended complaint that the parties entered into an agreement entitled, "Agreement Concerning Property Rights." The plaintiff seeks enforcement of the terms of the agreement. Said agreement was executed January 10, 1980.
In the second count of his amended complaint, the plaintiff asserts in the alternative, a claim for an annulment. He asserts that at the time of the "attempted marriage" the defendant was married to Alexander Lutecki, never having obtained a dissolution of her first marriage from a court of competent jurisdiction. CT Page 2737 Accordingly, the plaintiff seeks a dissolution of the marriage or in the alternative an annulment of the marriage.
The defendant in her amended answer and cross-complaint denies that the "Agreement" is valid and also claims that the marriage has broken down irretrievably. She therefore also seeks a dissolution of the marriage.
 II
The parties met in 1976 and dated until they were married on January 12, 1980. When the parties married on January 12, 1980, the plaintiff was 74 years old, and the defendant was 51 years of age.
Although the litigants assert that their marriage has broken down irretrievably, the parties are still living together.
The defendant takes care of the plaintiff in that she takes care of his house, provides his meals, tends to his clothing, and on one occasion, when he took a trip, she packaged his medication so that he could take his medication daily while he was away.
The plaintiff and defendant spend time together, they go on vacations, go out to dinner and sometimes work on puzzles when they are at home.
The plaintiff indicated some dissatisfaction with the marriage because of what he describes as a lack of companionship. However, he took no action earlier to dissolve the marriage. Also, when Mrs. Christoni needed medical attention because of her breast cancer, this strengthened Mr. Christoni's resolve to remain in the marriage.
The real cause of the marital strife is the status of the "Agreement." The "Agreement" was signed on January 10, 1980; subsequently, the status of the defendant's rights in the plaintiff's profit sharing plan came forth. In this regard the plaintiff's attorney prepared a waiver of the defendant's rights in the profit sharing plan. The waiver was initially signed by the defendant; however, she subsequently requested return of the waiver and therefore she has not waived her rights in the plan. This resulted in the plaintiff's attorney sending a transmittal to the defendant's attorney, see exhibit 41; said letter dated June 14, 1990 indicates that unless the waiver is effectuated, an CT Page 2738 action for dissolution would be commenced.
Mr. Christoni testified that he instituted the dissolution proceedings because he claims that Mrs. Christoni did not live up to the agreement and would not relinquish any interest she may have in his profit sharing plan.
There was testimony from Gerald Farrell, who is plaintiff's attorney, that the plaintiff never said to him that the marriage has broken down and that he wanted the marriage dissolved. The expectation of Mr. Christoni for the marriage was companionship.
The parties are still residing together and providing care, comfort and companionship to one another. However, the financial issue as to profit sharing plan has caused a fissure in the marriage, whereby the parties now seek a dissolution.
 III
Since the parties' claim that the marriage has broken down irretrievably and that there is no chance for reconciliation, the court finds the following facts as proved:
The plaintiff and the defendant, whose maiden name was Janina Lutecki, were intermarried on January 12, 1980 at Wallingford, Connecticut;
The plaintiff and defendant have resided in the state of Connecticut continuously for more than 12 months next preceding the date of the complaint;
The marriage of the parties has broken down irretrievably.
The marital problems relate to the mutual misunderstanding and expectations of the parties relative to the "Agreement" and specifically, the status of the defendant's interest in the plaintiff's profit sharing plan.
The cause for the breakdown of their marriage was Mr. Christoni's determination and insistence that Mrs. Christoni waive her interest in the plaintiff's profit sharing plan, which plan was provided through J. R. Christoni, Inc.
Mrs. Christoni had acquired a right to the plaintiff's profit sharing plan pursuant to the Retirement Equity Act of 1984. This CT Page 2739 right was bestowed subsequent to the date of the "Agreement", and such right is not covered by the Agreement.
Suffice it to say that because of the financial disagreement, and specifically the insistence by the plaintiff that the defendant waive her interest in the plan, the marriage has broken down irretrievably without any chance of reconciliation.
 IV
The plaintiff has five children from a previous marriage, which ended in divorce in 1968.
His education took him as far as the seventh grade. He became involved in construction work, and in 1931 started a transportation business, of which he was president. He now owns 52% of the stock in the business, and his sons own 48%.
In 1944 he served in the Army and was honorably discharged. On leaving the service he continued in the transportation business and now still works at Christoni, Inc. on a part-time basis. He has been described as a "self-made man."
The plaintiff's health is generally good although he suffers from emphysema, eczema and takes medication on a daily basis.
The defendant was first married in 1947 to a Mr. Lutecki. She has five children from that union which was dissolved in Haiti on November 23, 1971.
The defendant was born in Poland. She went as far as the fourth grade. She left Poland in 1942 and eventually immigrated to the United States in 1956. She went to night school to learn English, and in 1957 took a job at Middlesex Hospital as a dietary aide.
The defendant's health was generally good when she married the plaintiff. In 1983 she had a mastectomy and heart problems. In 1984 she was treated for a bladder suspension. Subsequently, tumors were removed, and in 1987 she had back surgery. She is presently on medication for tension headaches, an ulcer, high blood pressure, and medication to regulate her heart.
The defendant currently has health insurance through the plaintiff's company; however, when she attains the age of 65, CT Page 2740 which occurred on January 31, 1994, she is eligible for Medicare.
It would appear that based on her age, health, education and employment skills, the defendant's earning capacity is highly questionable. Whereas the plaintiff, who is 52% owner of Christoni, Inc., still works and receives a salary. His business which is family owned and run provides the plaintiff with future income.
 V
Since the financial determination of this case initially depends on the validity of the "Agreement Concerning Property Rights", the court must first decide the status of the "Agreement."
The pleadings place the validity of the "Agreement" in issue in that the plaintiff asserts the "Agreement", and the defendant denies that the document is a valid agreement.
The agreement, dated January 10, 1980, was executed two days before the parties were married. In their agreement, the right to be granted alimony is waived; however, the plaintiff agreed to pay the defendant $5,000 for each year of their marriage, up to $50,000.
The agreement goes on to set forth provisions in the third paragraph for Mrs. Christoni, if she is still the wife, whereby Mr. Christoni agrees to leave a will whereby Mrs. Christoni is allowed to reside in the family residence, a provision for a monthly allowance, and costs for basic hospitalization, basic surgical and major medical insurance during her life.
The sixth paragraph states as follows:
SIXTH: Janina acknowledges that Joseph has made full disclosure to her and to her attorney of his yearly income and financial assets. All questions have been answered, and all requested documents have been provided. Janina is aware that Joseph is a moderately wealthy man. Janina has also made full disclosure of her earnings and financial assets to Joseph.
The rules regarding antenuptial agreements are stated in McHugh v. McHugh, 181 Conn. 482, wherein the court indicated that an antenuptial agreement is a type of contract and must comply with CT Page 2741 the ordinary principles of contract law.
The court stated at page 485:
 Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice.
The plaintiff claims that the antenuptial agreement is valid and that the terms should be enforced. The plaintiff was represented by Attorney Gerald Farrell, and the defendant was represented by Attorney James Segaloff concerning the antenuptial agreement.
There was some dispute as to whether there were one or two meetings relative to the negotiations and signing of the agreement. Attorney Farrell testified that he emphasized the importance of a disclosure of the assets; however, it was indicated that the defendant was aware of the plaintiff's assets. At any rate, no financial affidavits or other financial documents were presented or exchanged.
When the agreement was signed, the plaintiff had a pension plan, which was not fully discussed with the defendant. Plaintiff also did not reveal the value of his real estate, the amount of his bank accounts, the nature of a buy-sell agreement regarding the plaintiff's corporation, and the full amount of his earnings, including interest on his bank accounts.
Gerald Farrell met with the plaintiff on October 11, 1979, at the request of the plaintiff for purposes of preparing an antenuptial agreement. Gerald Farrell suggested that Mrs. Christoni be represented, and she thereby retained Attorney Segaloff. Mrs. Christoni voiced no dissatisfaction with the CT Page 2742 agreement or reluctance in signing it. The agreement was signed at a meeting on January 10, 1980, and which meeting took less than one hour.
Gerald Farrell indicated that when the sixth clause of the agreement was discussed, the assets of the plaintiff were disclosed; however, their values were not indicated. Attorney Farrell also testified that he brought various documents concerning the plaintiff's assets, but their inspection was not requested by the defendant. Attorney Farrell indicated to Attorney Segaloff that plaintiff earned $50,000 in 1979. Attorney Farrell also mentioned the profit sharing plan, but not plaintiff's financial interest therein. Also, there was a buy-sell agreement relative to J.R. Christoni, Inc., and that was not revealed to the defendant; however, Attorney Farrell indicated that the value of the corporation was $500,000 and that plaintiff owned 52%.
Gerald Farrell also testified that at the signing of the agreement the defendant was aware that the plaintiff was a moderately wealthy man and did not appear interested in what he earned.
On his financial affidavit, dated November 29, 1993, the plaintiff shows total cash value of assets to be $1,242,907.34. This consists of the following: Real Estate, Christoni Lane, Wallingford, CT, $91,000; 440-448 North Cherry Street Extension, $150,000; 430 North Cherry Street Extension, $100,000 — bank accounts totaling $509,637.23; 52% ownership of J.R. Christoni, Inc., $75,000.00; insurance cash value, $11,702.05; profit sharing plan of J.R. Christoni, Inc., $294,558.06; and other assets, $11,010.00. At the trial the plaintiff corrected his financial statement as follows: Bank of Boston $32,327.38, Fleet Bank $92,850.07.
Testimony of Richard Brandt, of Pension Services Incorporated, indicated that the plaintiff is fully vested as to his profit sharing plan and that the value of the plan is $317,696.
Also, copies of plaintiff's income tax returns for 1982 to 1992, submitted in evidence, show gross income as follows:
1982 $ 80,462.
1983 $ 96,125.
1984 $114,814.64
1985 $123,069.32
1986 $122,328.
1987 $155,195.
1988 $207,024.
1989 $191,246.
1990 $143,106.
1991 $202,929.
1992 $ 89,686.
It is difficult to compare the financial status of the plaintiff on January 10, 1980 to that shown on his financial affidavit in that he did non disclose the value of most of his assets on January 10, 1980. CT Page 2743
The defendant's financial affidavit shows income from Social Security in the amount of $216.28 per week. Expenses are reflected as $604.44 per week. Her affidavit shows assets as follows: bank accounts $64,000.57, insurance policy $1,654.82, and an IRA account of $14,969.19 in the Dime Savings Bank.
In determining the status of the agreement, the court again looks to the McHugh case, where the Supreme Court stated the following at pages 486 and 487:
 An antenuptial agreement is a type of contract and must, therefore, comply with ordinary principles of contract law. In re Estate of Rosenstein, 326 So.2d 239
(Fla.App. 1976); In re Estate of Luedtke, 65 Wis.2d 387, 222 N.W.2d 643 (1974); 2 Lindey, op. cit. 90, p. 90-68; Clark, op cit. 19, p. 27, see 41 Am.Jur.2d, Husband Wife 283, 288. To determine whether an antenuptial agreement relating to property was valid when made, courts will inquire CT Page 2744 whether any waiver of statutory or common-law rights, or the right to a judicial determination in any matter, was voluntary and knowing. 148 Conn. 527, 534, 172 A.2d 614 (1961) . . . The duty of each party to disclose the amount, character, and value of individually owned property, absent the other's independent knowledge of the same, is an essential prerequisite to a valid antenuptial agreement containing a waiver of property rights . . .' The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory rights involved . . .' It has been said that `[u]nder ordinary circumstances, parties to an ante-nuptial agreement do not deal at arm's length; they stand in a relationship of mutual confidence that calls for the exercise of good faith, candor and sincerity in all matters bearing upon the agreement.
It is important to underscore that a party to an agreement is not required to inquire about the assets and financial status of the other party. The burden is on each to inform the other of their financial status. Without such full disclosure there can be no intelligent waiver of the statutory rights involved.
As stated in McHugh, supra, the parties stand in a relationship of mutual confidence that calls for the exercise of good faith, candor and sincerity in matters concerning the agreement.
While there is a divergence of testimony as to whether there were one or two meetings concerning the signing of the agreement, the evidence showed that the agreement was signed two days before the wedding.
Also, the assets of the plaintiff have increased dramatically from the date of the agreement and the dissolution. His pension plan grew to a value of $317,696, and the bank accounts grew to $509,637.23. Also, his income has shown substantial increases over the years. CT Page 2745
It appears that the financial circumstances of the parties at the time of dissolution of the marriage are beyond the contemplation of the parties at the time the agreement was entered into. Because of the substantial economic changes, to enforce the agreement would work an injustice.
The court finds that the lack of full disclosure was basically caused by the parties themselves in that they apparently felt they generally knew the financial status of another. Also, there was testimony that the union was based on love and not financial considerations.
The court also finds that there was a substantial change of monetary circumstances that was not contemplated by the parties.
Based on the totality of the circumstances, the court finds that the agreement does not meet the requirements of MuHugh, [McHugh] and accordingly finds the agreement to be invalid.
The court also notes that based on the totality of the circumstances, the court must find the agreement to be invalid; however, the ultimate financial award of the court is not significantly affected by the status of the agreement in that the pension plan, which is a substantial asset, is not covered by the agreement.
 VI
The plaintiff asserts that the marriage of the parties should be annulled in that he claims the prior marriage of the defendant to an Alexander Leutecki was not validly dissolved.
The facts relative to this claim are that the defendant and Mr. Leutecki were divorced in Haiti on November 24, 1971. The defendant, who was represented by an attorney, went to Haiti, while Mr. Leutecki, who was also represented by an attorney, did not. The defendant received a divorce in Haiti and ultimately married the plaintiff. Prior to the marriage, the plaintiff was aware of the defendant's divorce in Haiti. The first time he challenges the validity of said divorce is relative to the present proceedings.
As to the validity of the Haitian divorce, the first issue is whether the plaintiff has standing to challenge the defendant's CT Page 2746 prior divorce.
The defendant asserts that the plaintiff cannot make a collateral attack on an earlier judgment to which he was a stranger and cites the cases of Tippin v. Tippin, 148 Conn. 1
(1960); Murphy v. Murphy, 34 Conn. Sup. 251 (1978), and Cocco v. Cocco, 23 Conn. Sup. 275 (1962). Murphy and Cocco note that at the time of the divorce the plaintiff had no legally protected interest, and that the divorce decree in effect, made the plaintiff's marriage possible.
The defendant also contends that equitable doctrines such as estoppel or laches should bar the plaintiff from securing a judgment of invalidity. The case of Bruneau v. Bruneau, 3 Conn. App. 453, is cited where the court stated:
 The rule precluding a person from attacking the validity of a foreign divorce if, under the circumstances, it would be inequitable to do so "is not limited to situations of what might be termed `true estoppel' where one party induces another to rely to his damage upon certain representations as to the facts of the case." 1 Restatement (Second), Conflict of Laws 74, comment b. "[I]f the person attacking the divorce is, in doing so, taking a position inconsistent with his past conduct, or if the parties to the action have relied upon the divorce, and if, in addition, holding the divorce invalid will unset relationships or expectations formed in reliance upon the divorce, then estoppel will preclude calling the divorce in question." Clark, "Estoppel Against Jurisdictional Attack on Decrees of Divorce," 70 Yale L.J. 45, 57 (1960). Thus, if one party has accepted benefits under the original decree or waited an unreasonably long time before attacking it, an invalid decree will be held immune from attack, particularly if the other party has remarried in the meantime. 1 Restatement (Second), Conflict of Laws 74, comment b. Consequently, even if a divorce decree rendered in a foreign country is CT Page 2747 jurisdictionally invalid under the general rule set forth in Litvaitis, the judgment may be permitted practical recognition. Baker v. Baker, supra. We find that this is such a case.
Here, the plaintiff, a stranger to the Haitian divorce, married the defendant in reliance on it. The plaintiff in effect has benefited from the divorce decree, and it would be inconsistent and inequitable to allow him to collaterally attack it. Therefore, the court will not permit a collateral attack on the Haitian divorce decree.
 VII
The defendant has, through her counsel asked for an award of counsel fees pursuant to Conn. Gen. Stat. 46b-62. The defendant in her post trial memorandum has reflected counsel fees in the amount of $74,679.50 and expenses of $12,173.96 for a total of $86,853.46. In reviewing such a request, the court has considered the criteria set forth in 46b-82.
The court must consider the effect of its other financial orders in awarding counsel fees. The court must also consider, if based on the total financial resources of the parties, that not to grant attorneys fees would undermine other financial orders. Eslami v. Eslami, 218 Conn. 801 (1991).
The court feels that based on the disparity in the parties' financial status, the defendant lacks the financial resources to pay her attorneys fees. Also, attorneys fees and costs will be awarded to protect other financial orders to be entered by the court.
 VIII
Prior to issuing its financial orders, the court makes the following observation: that because of all the circumstances in this matter and particularly because of the nature and extent of the plaintiff's assets and his age, that a lump sum alimony is appropriate; further, because of the dissention caused by the status of the plaintiff's pension plan, that the pension plan should be retained by him and that the lump sum alimony be paid in cash from sources other than the pension plan and that the payment be made within 60 days. CT Page 2748
 IX
The parties' respective financial affidavits show that the plaintiff has substantially more assets than the defendant. The three major assets he has are real estate, bank accounts and a profit sharing plan with a value of $317,696.
The defendant's financial affidavit shows that she has $64,000.07 in bank accounts and $14,969.19 in an IRA account.
Joseph Kelley of the Social Security Administration Office testified that the defendant will receive benefits of $977.10 per month, minus $41 to Medicare, as of January 1994. He indicated that if the defendant had not married the plaintiff she would have received $485.50 per month based on her employment record. And, if the defendant is a widow in 1994, she would receive $2,291.70 per month. The defendant will also receive a monthly pension amount of $157.86 as of February 28, 1994, based on her employment with Middlesex Hospital.
The defendant's present health insurance is paid for by the plaintiff's company. The defendant's financial affidavit indicates on line 7 for insurance premiums, medical/dental $62.41 per week and line 8 medical/dental $82.80 per week.
After reviewing all the facts found, the evidence presented, the exhibits and the statutory criteria as set forth in Connecticut General Statutes 46b-62, 46b-81 and 46b-82, the court finds it has jurisdiction and enters the following orders:
(1) The marriage is dissolved and a decree of dissolution may enter.
(2) The defendant shall have 90 days from the judgment of dissolution to vacate the home at 6 Christoni Lane.
(3) The defendant shall have the right to take with her the items of personal property belonging to her as listed on Schedule E of the defendant's post-trial memorandum, dated February 10, 1994.
(4) The plaintiff is entitled to all personal property as reflected on his financial affidavit. CT Page 2749
(5) The plaintiff is entitled to all right, title and interest to certificates of stock held in J.R. Christoni, Inc.
(6) The plaintiff is entitled to all right, title and interest to the Metropolitan Life Insurance Policy.
(7) The plaintiff is entitled to all right, title and interest to all real estate listed in his name as reflected on his financial affidavit.
(8) The plaintiff will provide medical insurance for the defendant, at her expense, for so long as such coverage is available under applicable law.
(9) The plaintiff shall pay to the defendant lump sum alimony in the amount of $225,000 within 60 days.
(10) The plaintiff has an existing pension or profit sharing plan. Said pension or profit sharing plan shall be the sole property of the plaintiff, and the defendant shall have no interest in said plan.
(11) The plaintiff shall pay to the defendant the sum of $25,000 as an allowance toward her counsel fees and $5,000 for expenses incident to this litigation. Said sum to be payable within 60 days.
(12) The parties may retain any other assets shown on their respective financial affidavit.
Stengel, J.