[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown by complaint returnable to this court on July 18, 1995. He also sought alimony, a property settlement, and other relief. The defendant wife admitted the allegations in the complaint, and in her cross complaint, sought a dissolution on the ground of irretrievable breakdown. She also sought alimony, an equitable division of the real and CT Page 3037 personal property, and other relief.
The parties were represented by counsel throughout these vigorously and bitterly contested proceedings. At trial, both parties testified and submitted financial affidavits. The parties filed written proposed claims for relief. Many documentary materials, including deeds, mortgage documents, appraisal reports and tax returns, were introduced into evidence. A number of witnesses were called to testify, including the parties' son, a friend of the husband's, his `landlord', a police officer, a real estate appraiser, a certified public accountant who valued the husband's retirement benefits, and an attorney who performed `estate planning' for the wife's parents. The parties were granted time to file posttrial briefs, and did so. At the conclusion of the taking of evidence, upon oral motion to modify alimony by the plaintiff, the filing and hearing of which was consented to by the defendant, the court ordered that the pendente lite order of alimony be modified to $75 per week. Other orders were entered re: the continuation of health insurance and payment of premiums.
From the evidence, I find as follows.
This couple was married for the second time to each other on April 26, 1977, in New London, Connecticut. Their first marriage ended in divorce. The wife's birth name was Turner. The husband resided continuously in this state for one year before the filing date of the complaint, July 11, 1995. There are no minor children of the second marriage, and none were born to the wife since the date of this marriage. There is a child, issue of their first marriage, who is now 28.
Neither spouse is a recipient of public assistance, all statutory stays have expired and the court has jurisdiction.
The husband is 54 years of age and a high school graduate by GED, which he obtained in the military. He received a `technical' degree and periodically took college courses. He had been employed as a construction representative for a utility company for the past 21 plus years. He was responsible for overseeing construction contractors. He earned $1,010[1] per week gross, $674 per week net. He had health and life insurance benefits associated with his employment. Also, a 401K plan and retirement benefit plan in which he is vested. CT Page 3038 He suffers from a number of health problems, including three disc surgeries in his back, a kidney stone condition, which required two hospitalizations, and a shoulder problem. Despite these conditions, his ability to perform his job did not appear to have been impaired appreciably, and he worked full time.
Between the first and second day of trial, the husband's employment was terminated as a result of his employer's downsizing and an unfavorable job evaluation by his immediate supervisor. He now expects to receive $350 per week as unemployment compensation. He received a severance/settlement package which included approximately 42 weeks of salary which will net him, after deductions for federal income tax, etc., about $25,000 in a lump sum.
Although his demonstrated earning capacity has been about $1,000 per week, due to his present age and health, I find that in the `real world', his achievement of that earning capacity in the future is unlikely.
The defendant wife is 52 years of age and a high school graduate. She had been the principal homemaker and child care giver during the marriage and worked as a clerk for only one year during her adulthood. She continues unemployed at this time, and has a modest earning capacity. She has made no attempt since the commencement of these proceedings to secure vocational or educational training to equip herself for suitable employment.
The wife suffers from asthma and an irritable bowel for which she takes medication. She had disk surgery in 1964, and recently sustained a fractured wrist; however, her health problems did not appear to impair her ability to do house work, drive and engage in other incidents of normal daily living. She provides almost daily assistance to her elderly parents; her father has Alzheimer's disease. The wife is in therapy.
The husband essentially ascribes the cause of the destruction of the marriage to the wife's bizarre and irrational behavior, including persistent nagging, the taking of inconsistent positions, verbal abuse, `love of money', `clinging', and threats of violence. Following an altercation in the family home during the summer of 1995, which resulted in her arrest, he obtained protective[2] and restraining orders which compelled her to leave the marital dwelling. This action CT Page 3039 promptly ensued.
The restraining order was modified in pendente lite proceedings, and the wife was restored to the home and granted its exclusive possession. The husband now resides in an apartment as a boarder-tenant. The wife asserts that the husband has had relationships with other women; however, there was little credible evidence as to the extent of such relationships, if any. She ascribes the cause of the marital breakdown to the husband's verbal abuse of her, his lack of consideration for her, and his drinking. She claimed he never asked her to go anywhere with him, and only wanted to be with his friends. At the same time, however, she refused to travel by air and disliked his friends.
The reality of the situation portrayed by the evidence is that for the last few years at least, the spouses did not communicate with each other or show consideration for the other's wishes. They often argued. Although they attended marriage counseling, it did not help. They largely led separate lives and appeared to share no common interests. Their behavior toward each other is sharply illustrated and echoed by the testimony of their now adult son who was involved in heated confrontations with each of his parents, which arose over minor provocations. It is abundantly clear that their marriage is destroyed and irretrievably broken down. When I weigh the credibility of the parties, by considering their attitude, conduct and demeanor, I find that the husband's version of the causes of the breakdown more credible. Although both parties certainly contributed to the shattering of their marriage, the wife must bear a greater share of the responsibility for its destruction.
The parties enjoyed a modest, even thrifty, life style. They went on vacations of very short duration. The husband was a good provider, and they and their son, who graduated college, never wanted for material things.
They have accumulated substantial assets. The marital dwelling which is a single-family `log cabin' type dwelling, 10 Burlake Road, Quaker Hill, Connecticut, was constructed largely through the efforts of the husband, who did much work on it himself, on a lot purchased by him for $8,800 between marriages. After the home was completed, the husband worked incessantly and laboriously on the house for a long time to CT Page 3040 repair a bark beetle infestation problem.
The wife asserted that in the first divorce an arrearage was found due her from the husband of $3,800, which was never paid, and since it was not, she at least indirectly, contributed to the lot purchase. The husband, while conceding the arrearage was not directly paid, counters that the parties resided together for a period of time before their remarriage, and that he paid all of the household expenses. Moreover, he claims that he paid the wife's then attorney $300-$400 to attend to the matter, and he believed the matter was resolved. The wife makes no claim in these, or any other proceedings, for repayment of that arrearage, and I deem that claim abandoned.
I find that the now jointly-owned home has a value of $137,500 less a sewer lien with a balance of $1,723 plus interest, for an equity of approximately $135,777. The parties also own jointly-owned land in New Hampshire which I find is worth $25,000, but was purchased for $47,000 in 1990. The husband has a 401K plan which accumulated during his employment. It had a present net value of $74,161[3] as of September 30, 1995. His retirement plan, also accumulated through his employment, has a present value of $62,351, and would have provided him with $928 per month at age 55 if he remained employed at retirement, and larger monthly benefits should he retire at later dates. However, the present values of the retirement plan at the greater ages decrease accordingly. His `vested' monthly benefit is $425 at age 55.[4]
The plaintiff also discloses on his financial affidavit an 1981 Oldsmobile motor vehicle valued at $500 and a bank account with $300. He did not disclose a personal injury claim, which is unliquidated.[5] The wife discloses a 1969 Rambler motor vehicle valued at $200, a 1982 Oldsmobile at $1,000, a certificate of deposit (CD) of $18,000, a checking account with $663 and $5,500 in cash.
The CD was derived from the wife's personal injury settlement of about $4,400 which accrued interest. Against these assets, the wife discloses as her only liability, the sewer lien above noted; the husband, in his amended affidavit, $28,443, which includes the 401K loan, $8,069 to the Internal Revenue Service and a $374 hospital bill. His second amended affidavit filed posttrial reports that his liabilities have been reduced to $10,443. See note 7, infra. CT Page 3041
Apart from the $18,000 CD, her motor vehicle, and the assets received by the wife from her parents, which will be hereinafter discussed, the husband's monetary contributions substantially accounted for the acquisition, preservation and appreciation in value of the balance of the marital assets.
After the husband completed the dwelling, the wife prevailed upon him to deed the property in joint names. They executed an agreement in 1980 contemporaneously with that deed. See Exhibit L. Also, the wife placed her CD in joint names at that time. Exhibit L provides, in pertinent part:
"The parties hereby agree that any property held in their own names individually or in joint names shall be considered joint property and they shall share said property on a 50/50 basis." The preamble to this provision states that the parties wish to resolve any questions of their respective ownership of personal property. (Emphasis added.)
The wife now renounces this agreement, claiming that she entered into it involuntarily, despite the fact that she acknowledged its execution as her free act and deed before an attorney. She also removed the husband's name from the $18,000 CD and removed about $17,000 in jointly held bank accounts. She used about $11,000 of the latter for living expenses and attorney's fees. While renouncing the agreement, she does not tender a quitclaim deed of her interest in the marital dwelling to the husband. I find her position in this regard inconsistent and not credible.
Although the agreement was for consideration, it is ambiguous, and appears to only relate to property the parties owned at the time the agreement was executed.[6] It cannot be deemed to be an antenuptial agreement, as it was not executed before the marriage. Moreover, the court must be satisfied from the record, before such an agreement could be held valid and enforced, that there must be a knowing waiver of a statutory or common law right. See McHugh v. McHugh, 181 Conn. 482
(1980). There was no credible evidence to support such a finding.
Section 46b-66 of the Connecticut General Statutes provides that ". . . where the parties have submitted to the court an agreement concerning the custody, care, education, CT Page 3042 visitation, maintenance or support of any of the children, or concerning alimony, or the disposition of property, the court shall inquire into the financial resources and actual needs of the spouses . . . in order to determine whether the agreement of the parties is fair and equitable under all the circumstances . . . ." Thus, all such agreements are subject to approval by the court. The court is not bound by agreements entered into by the parties; nor, is it bound by an agreement offered by either party which provides for the distribution of property, when it is objected to by the other party, unless it finds that agreement to be fair and equitable under all of the circumstances. The court must be free to fashion its awards it a way which it determines to be fair and equitable under the totality of the circumstances. See Sands v. Sands, 188 Conn. 98
(1982), cert. denied, 459 U.S. 1148, 103 S.Ct. 792,74 L.Ed. 20, 997 (1983).
The agreement here is ambiguous at least in two respects. First, its intention is not clear as to whether it applies only to personal property, or to both real and personal property. Second, it is not clear as to whether it was intended to apply to only the property then owned by the parties at the time of its execution, or also included after acquired property. There is insufficient credible evidence in the record to enable the court to discern the parties' intent with respect to the agreement. Moreover, neither party demands that the agreement should be literally enforced. Finally, it clearly was not intended to provide a resolution of all property and alimony questions in the event of a dissolution of the parties' marriage.
When considering all of the statutory criteria in General Statutes §§ 46b-81 and 46b-82, I cannot conclude that the agreement is fair and equitable. Nor can I determine what the intent of the parties was, as expressed in the agreement. Therefore, for the above stated reasons, I decline to enforce it.
As noted previously, the wife removed the husband's name from the $18,000 CD in early 1995, and in June, 1995 removed all of the funds from the joint bank account, approximately $17,000, for a total of $35,000. The husband acted similarly. He cashed in a life insurance policy for $12,700 and borrowed $20,000 from his 401K plan, of which $10,000 has not been spent. The remainder of these funds was used for attorney's CT Page 3043 fees and living expenses. The surrender of the life insurance policy resulted in a taxable realized gain of $7,379, which exposed him to an income tax liability for 1995. A portion of this anticipated liability was incorrectly described on his January 10, 1996 financial affidavit, but was reported on his amended affidavit filed on the second day of trial. The greater portion of this anticipated tax liability derived from the 401K loan.[7]
In 1994, the wife entered into a series of transactions with her elderly parents as part of their `estate planning'. The primary focus of the transactions was to insulate the parents' estate from recapture by the state or denial of medicaid and other benefits if the parents, who are now in their 80s (the mother is 85; the father, 81), entered a nursing home. The parents deeded a remainder interest in their mortgage-free home to the wife in exchange for a mortgage note and deed of $74,000 payable on demand after three years. The mortgage note required quarterly interest payments. The implicit intent of this transaction was that the parents would gradually exonerate the defendant from repaying the mortgage balance by making annual gifts to her of the principal. This was borne out by the wife's disclosure on cross examination that her parents had forgiven $50,000 in principal, thereby increasing the value of her equity interest to approximately $78,500. The property has a value of $102,500 and the parents reserved what is in essence a joint life estate,[8] which was valued at the time of the transaction at $28,500.
Also in 1994, the parents transferred to the wife bank accounts totalling about $165,000, which were placed in the wife s name jointly with the parties' son or naming him as survivor beneficiary, and over which she has complete dominion and control. The wife's financial affidavit discloses only that she has a `reversionary interest' in the parents' home and that she is `trustee' for her parents' bank accounts. Her affidavit, upon which so much depends in a marital dissolution case, omits to report the value of her remainder interest in the 19 South Bartlett Road home, the present mortgage balance thereon, the present CD account balances, the interest income on these accounts (and on her own $18,000 CD), and the quarterly interest payments called for by her parents' mortgage.
The wife's attorney claimed that the omissions with CT Page 3044 respect to the values and income derived from the parents' gifts were due to the claimed status of the assets, and candidly shoulders the responsibility for the omissions. The wife basically argues that the parents' gifts to her may be subject to `defeasance'. She means that if they entered a nursing home and applied for governmental assistance, some or all of this property would be reclaimed by the state, or benefits denied to the parents until the assets would have been deemed to be exhausted for nursing home expenses. She also asserts that she morally bound herself to her parents as a trustee of these assets, and in effect, her parents are the beneficial owners thereof. Hence, she claims the assets need not be disclosed on her financial affidavit, nor are they subject to distribution or to consideration when determining an alimony award, or, an equitable property distribution. I find none of these claims persuasive.
The testimony and evidence discloses that the aggregate balance in the three CDs which the wife has total control over was $147,172, as of May 20, 1994.[9] See Defendant's Exhibits 10, 17 and 18. Each of these balances accrue interest at the rate of 5.25 percent per annum. All three mature May, 1998. The total annual interest income on these funds is $7,726 per annum or $149 per week; if compounded, more. The $18,000 CD, if also at 5.25 percent, would provide an additional $18 per week. Neither the financial affidavits or the evidence fully discloses this income, or what is done with it, or, the present balances of the CD accounts.
The wife points to no trust agreement or written document imposing a legal obligation upon her to devote the funds or the income thereon to her parents or for their benefit. The funds are fully vested in the wife, and therefore the assets and the income derived from them should have been reported on her financial affidavit.
The bank accounts and remainder interest in the parents' dwelling, having been fully vested in the wife, are not a contingent remainder as in Rubin v. Rubin, 218 Conn. 801
(1991), nor a mere expectancy of receiving an inheritance in the future as in Krause v. Krause, 174 Conn. 361 (1978). Nor is the amount thereof clouded with the uncertainty generated by a pending will contest, as in Eslami v. Eslami, 218 Conn. 801
(1991). Nor is this a situation involving a trust where the beneficiary had no power to invade the corpus and was not CT Page 3045 entitled to payments of principal without exercise of the trustee's discretion, as in Tremaine v. Tremaine, 235 Conn. 45
(1995). In short, the assets held by the wife in this case clearly constitute a presently existing property interest subject to assignment by the court pursuant to General Statutes § 46b-81. There can be no question that a court may assign property which either spouse receives through gift or inheritance. Section 46b-81(a) provides in relevant part that in a dissolution action, the court may "assign to either the husband or the wife all or any part of the estate of the other." "The estate, as referred to in the statute, comprehends the aggregate of the property . . . of each." (Internal quotation marks omitted.) Tyc v. Tyc, 40 Conn. App. 562,565 (1996). And certainly, the estate of a spouse (which includes inherited property, as here) must be considered in fashioning awards of property and alimony. Sections 46b-81 and46b-82. Section 46b-81 does not limit, either by timing or method of acquisition or by source of funds, the property subject to a trial court's broad allocative power. Krafik v.Krafik, 234 Conn. 783, 792 (1995). Therefore, the gifted assets must be considered by this court in rendering its judgment of dissolution, and the concomitant financial awards.
Although, the defendant wife may have had no intent to misrepresent the value or state of ownership of the gifts received from her parents, it is clear that her financial affidavit is, at best, misleading, as it fails to accurately portray her financial condition.
The husband has had superior earnings, vocational skills and earning capacity than the wife. The present employability and earning capacity of both spouses is problematic and not quantifiable under the present circumstances, considering their ages, the economy and the labor market. The wife has made no recent effort to obtain vocational training and has been out of the job market a long time, even considering her considerable homemaking and housekeeping skills, and her early computer training.
These spouses have strenuously and vigorously litigated every aspect of this case, including the distribution and possession of the marital dwelling. Each has an affinity to the family dwelling. The wife, due to her emotional make up, has greater need for it. They resorted to arbitration to determine the distribution of their tangible personal property, CT Page 3046 including their household furniture and furnishings. The arbitrator characterized the proceeding before him as acrimonious. The binding arbitration award was introduced into evidence and is hereby confirmed.
I have considered all of the factors in General Statutes §§ 46b-62, 46b-81 and 46b-82 in light of the evidence and my findings in the determination of the financial orders set forth below. I have also considered the parties' nonmonetary contributions to the marriage. Finally, I have considered the taxable implications and consequences of said awards.
Accordingly, judgment is entered dissolving the marriage on the ground of irretrievable breakdown.
The following orders shall also enter.
(1) All right, title and interest in the following is vested in and assigned to the wife: 10 Burlake Road, Quaker Hill, Connecticut (subject to the mortgage later set out to husband in paragraph 2 below), subject to the sewer lien, which she shall assume, pay and save him harmless; the 1982 Oldsmobile and 1969 Rambler motor vehicles, the personalty awarded to her in the arbitrator's award (Plaintiff's Exhibit M), her CD, checking accounts and cash; the CDs referred to in Defendant's Exhibits 16, 17 and 18; and her remainder interest in 19 South Bartlett Road, Quaker Hill, Connecticut. There is also vested in and assigned to her a 40 percent interest in the husband's Northeast Utilities retirement benefit, valued as of the date of the decree, to be accomplished by Qualified Domestic Relations Order (QDRO). If she predeceases him, said 40 percent interest shall revert to the husband, and he shall be the survivor beneficiary thereof.
(2) All right, title and interest in the following is vested in and assigned to the husband: the land in Brookfield, New Hampshire; the 1981 Oldsmobile motor vehicle; the personalty, furniture and furnishings awarded to him in the arbitrator's award; his checking account and severance and vacation pay; his 401K plan; his personal injury and wrongful discharge claims; and the remainder (60 percent) of his retirement plan benefit of which the wife shall be the pre-retirement and post-retirement survivor beneficiary. The wife shall also execute and deliver to the husband a mortgage note in the amount of $40,200 secured by a mortgage deed on the 10 CT Page 3047 Burlake Road, Quaker Hill, Connecticut, premises. The mortgage principal shall be due and payable, together with interest accruing at 4 percent per annum, on the first to occur of the following events: the wife's death or remarriage, or cohabitation pursuant to General Statutes § 46b-86(b); her sale or transfer of the premises; her ceasing to reside there as her principal residence, or, January 1, 2006.
The note and mortgage shall contain default provisions typical in residential bank mortgages in New London County; shall provide that interest shall accrue at the rate of 10 percent per annum in the event of default, for a thirty day grace period; for attorney's fees in the event of default, and that the plaintiff shall be named as mortgagee loss payee on the homeowner's insurance policy insuring the mortgaged premises.
(3) The arbitrator's award relating to personal property is confirmed.
(4) Each party shall pay his or her own attorney's fees and the liabilities shown on their respective financial affidavits; and, one half of the arbitrator's fees within thirty (30) days.
(5) The husband shall continue the wife as a covered dependent under his former employment-related health, medical and dental insurance for the 36 month period statutorily available, and shall pay one half the premium therefor. This obligation shall terminate sooner upon the wife's death or remarriage or cohabitation and shall be deemed periodic alimony.
(6) The husband shall pay to the wife the sum of $130 per week as periodic alimony. Upon his retirement benefit going into pay status, the periodic alimony shall be reduced to $1 per year. The wife shall likewise pay the husband periodic alimony of $1 per year. The periodic alimony awards entered herein shall terminate upon the death of either party; also, in the event of the remarriage or cohabitation of the payee spouse or the payee spouse reaching the age of 62, the payor spouse's obligation to pay alimony shall be terminated. The duration of said alimony awards shall not be otherwise modifiable. The court retains jurisdiction to determine arrearages, if any, from the modified pendente lite alimony award. CT Page 3048
(7) All documents incidental or necessary to the effectuation of these orders shall be executed and completed by the parties within thirty (30) days hereof. The court shall retain jurisdiction over the QDRO until accomplished and completed. The personal property shall be transferred within thirty (30) days hereof.
Teller, J.