[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a dissolution of marriage action. The court makes the following findings. The parties were married on July 1, 1989. There are no minor children issue of the marriage. One of the parties have resided in Connecticut continuously prior to the bringing of this action. Neither of the parties have been recipients of public assistance. For the reasons stated hereinafter, the court finds the marriage between the parties has broken down irretrievably, with no reasonable hope for reconciliation.
The plaintiff, Bernadine Colby is 48 years old. She has a high school education. Her health is basically good. However, she is treated for high blood pressure and has been followed by a psychiatrist since 1994. She self-administers Valium and a tranquilizer under doctor's supervision. Ms. Colby has worked regularly for many years. Her job skills gained over the years are in management and clerical skills. In 1985, with one other individual, she formed her own company, Direct Images, Inc. She is both the president and general manager of Direct Images. Her work includes estimating, quoting, pricing, selling, and customer complaint fields.
The defendant, William J. Colby, Jr. is 46 years old. He has a high school education. His health is good. While there was absolutely no testimony about his income, his financial affidavit discloses that he is employed as a production manager for Canton Racing Products. The evidence failed to disclose any significant information about his employment skills. He appears to have an entrepreneurial spirit, having owned for a period of time a pewter shop in Florida and a business that he owned and ran in a hands-on sort of way, Fries Stamping Spinning. He owned Fries at the time of the marriage and sold it during the marriage.
Shortly after the parties married, they purchased a home in Guilford. The entire down payment of approximately $126,000 came from Mr. Colby. In January, 1992, they sold that property. The net proceeds were only $65,225.58. That money was deposited in a bank account in Mr. Colby's name and ultimately utilized in a variety of ways. Mrs. Colby wanted $35,000 of the money for her business, Direct Images. Mr. Colby was hesitant to lend the CT Page 4071-G money. Mrs. Colby was not pleased, suggesting that if this was the way their marriage was going to be, they might as well divorce immediately. Mr. Colby lent the $35,000 to the Direct Images business. Some of the balance of the funds were used to pay credit card debt; they took the balance of it and other funds of Mr. Colby's and purchased a donut franchise in Florida in 1992. The start up costs were about $100,000. Mr. Colby had sold his business, Fries Spinning and Stamping and a commercially zoned building lot in Durham. The parties never recouped the investment in the Florida donut business. It was ultimately a failure and merely closed up. However, for the time that it operated, they had bought a home in Florida and Mr. Colby had moved down there. Mrs. Colby spent much of her time in Florida, trying to work at Direct Images long-distance. The parties returned to Connecticut from Florida in mid-1993. As a result of the donut business losses, the parties had a $15,000 tax refund. The bulk of those proceeds were used to remodel the kitchen in the plaintiffs condominium. Mr. Colby went to work for Direct Images, doing whatever labor was required. He was paid by Direct Images.
In 1991, Direct Images bought a Heidelberg Press for its business operation. Mrs. Colby personally signed for the debt. She asked Mr. Colby to co-sign because the creditor required it. He did not want to so commit himself. Mr. Colby capitulated and is now a co-signor on that debt. To attempt to protect his interests, Mr. Colby obtained a UCC-1 security agreement from Direct Images, Inc. secured in the inventory and equipment. As stated elsewhere in this opinion, the note for the Heidelberg Press is now in serious default.
During the parties' marriage, Mr. Colby's father gifted the parties his home in Florida, referred to as the "Florida condo" on their respective financial affidavits. Initially it was not his intent to gift it to both of them, only to his son, Mr. Colby. After the plaintiff made her interest in that property known to Mr. Colby, the elder and her husband, it was gifted to both of them. Also the parties received two unimproved lots in San Carlo, Florida from Mr. Colby's father.
The parties' marriage seemed to devolve over time. Little testimony was evinced on the problems in their relationship. The evidence at hand discloses that the parties approached their business interest vis-a-vis their marriage differently and that Mr. Colby felt he was always on the giving end with Mrs. Colby on CT Page 4071-H the receiving end. The parties tried marital counselling more than once with no success. Mrs. Colby suggests that her husband had an affair or relationship with another woman while setting up the donut business in the summer of 1992, while he was in Florida and she was in Connecticut. She felt this was the major cause of the breakdown of the marriage. The court rejects that accusation.
Mrs. Colby was able to procure her name on the Florida properties in September, 1992, after these supposed misdeeds by Mr. Colby that she testified were the cause of the breakdown of the marriage. Mr. Colby's father died on February 14, 1995. He had been critically ill for a couple of months before that. One week after his death, Mrs. Colby filed this dissolution of marriage action. The inventory of the estate of the deceased, Mr. Colby, is $516,569.00. Mr. Colby is the sole beneficiary of the estate.
Mrs. Colby has been driving a 1991 Ford Thunderbird since sometime in 1994. The car belongs to the Estate of William J. Colby, Sr. She is seeking an order that her husband, the executor be ordered to turn the motor vehicle over to her.
Mrs. Colby is living in her home in Guilford, which she owned prior to this marriage. Mr. Colby is living in his father's home.
The parties respective affidavits show ownership interests in IRAs, whole life insurance, motor vehicles and sundry bank accounts. Because no evidence was elicited as to the date of their respective origins, the court concludes that these were all assets procured during the time of the marriage of the parties.
This is not a first marriage for either of the parties. Mrs. Colby had a daughter, who Mr. Colby adopted after their marriage, when the child was 17 years old. The parties executed a pre-marital agreement prior to marriage. One of the issues before the court is the enforceability of that pre-marital agreement. The defendant, among other relief, seeks its enforcement; the plaintiff seeks the court to, among other things, find it unenforceable.
"Antenuptial agreements relating to the property of the parties, and more specifically, to the rights of the parties to that property upon the dissolution of the marriage, are generally enforceable where three conditions are satisfied: (1) the contract was validly entered into; (2) its terms do not violate CT Page 4071-I statute or public policy; and (3) the circumstances of the parties at the time the marriage is dissolved are not so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice."McHugh v. McHugh, 181 Conn. 482, 485-6 (1980).
To determine whether the contract was validly made, the court must determine whether the parties' waiver of their statutory rights was done in a "voluntary and knowing" manner. This requires a determination as to whether there has been full financial disclosure, which is essential to the upholding of an antenuptial agreement. Ibid.
In the Agreement between the parties, the parties list assets that they owned at the time of signing. Among the assets listed for Mr. Colby is $15,000 in the bank. The Agreement further stated that the parties were buying a house and that the entire down payment for it was coming from Mr. Colby. The plaintiff, Mrs. Colby seeks to avoid the pre-marital agreement. She claims that Mr. Colby failed to disclose two significant assets: his individual retirement accounts (IRAs) and a joint checking account that he kept with his father.
The parties had located the home that they intended to buy before they had signed their premarital agreement. The contract for purchase of 351 Three Mile Course, Guilford by the parties was signed sometime in late May or early June, 1989. The pre-marital agreement was signed on June 20, 1989. The parties were married on July 1, 1989. On July 14, 1989, the parties purchased the Guilford property. At closing, Mr. Colby came up with over $115,000. Mr. Colby acknowledges that he did not list his IRAs and balance of savings, but that Mrs. Colby was aware of them because that they had discussed that was what he intended to utilize for the down payment on the home the parties were about to purchase. The pre-marital agreement referenced that impending house purchase. He had approximately $35,000 in IRAs, and the balance would come from his savings and money from his father. Mrs. Colby acknowledged that the down payment for the home was about $120,000, and, she was aware of it at the time of the signing of the pre-marital agreement. The court concludes that is why these funds weren't referenced as savings in the Agreement. The parties knew they were to be utilized to purchase the house. Indeed, the Agreement established a vehicle for Mr. Colby's recovery of these sums, someday. Mrs. Colby also knew of Mr. Colby's joint banking account with his father. It was CT Page 4071-J disclosed by him at the time the parties applied for a mortgage from Bank of Boston and Guilford Savings Bank. Further, there is no claim that it was an asset of value. Indeed, as Mrs. Colby testified, she realized that he ran some of his own personal bills, as well as his father's through that account.
Both of these people are astute in the world of business. The plaintiff's assertion that she was not privy to all of this information and just trusted that Mr. Colby was going to somehow come up with the down payment is disingenuous. She was savvy in her own business and savvy about the finances of Mr. Colby's father. Both parties had already gone through a divorce. She insisted that the premarital agreement have the provision protecting her from claims of Mr. Colby for return of the down payment, beyond whatever equity might be in the house. She asks too much to expect this court to believe that she was blind as to the sources of the down payment, to wit, Mr. Colby's assets.
"The burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory rights involved." Ibid at 486-7.
Mrs. Colby initiated the idea of a premarital agreement herself. She wanted it because she had a very successful business in Direct Images, Inc. She wanted to protect her business investment. The court finds that the plaintiff knew the assets of the defendant; she knew what they were and substantially how much was there. The first prong of the McHugh test is satisfied.
A premarital agreement is enforceable only if its terms do not violate statute or public policy. The agreement here provides that all assets owned prior to the marriage remain in the name of the party who owned them. The agreement further provides that, although the parties were buying a house jointly with only money of the defendant as down payment, he was only entitled to a return on his money to the extent it could be rendered from the equity. The agreement provided that any inheritance or accretion in value of business assets would not be divisible, but belong only to the party the beneficiary thereof. These provisions coupled together sought to protect each party's interest in anticipated windfall to them. Mrs. Colby, of course, did not want to share any part of Direct Images, Inc. which was doing well as a result of her efforts. Mr. Colby did not want to share any of CT Page 4071-K his anticipated inheritance from his father, the product of his long and close relationship with his father, for whom he was the natural object of his bounty. Alimony claims were waived; at the time of the agreement Mrs. Colby disclosed an income of $52,000 a year. Nothing in these provisions can be seen to contravene public policy or law.
The third prong of the McHugh test requires that ". . . the circumstances of the parties at the time [of final hearing not be] so beyond the contemplation of the parties at the time the contract was entered into as to cause its enforcement to work injustice."
At the time of the final hearing, the plaintiff is faced with the necessity of selling Direct Images, Inc. to pay debt at a price that will realize no gain, also leaving her with the probability of no employment in the immediate future. Her immediate income she is drawing from Direct Images while she attempts to market It is at $690 per week compared to $1000 per week at the time of the signing of the agreement. (Further, Mrs. Colby was offered employment as part of one possible sale of Direct Images, which she refused. She is a person with significant job skills). The business has one prospective buyer but there is no written contract for sale. Her unpaid personal tax liability resulting from the business (941 tax liabilities) for the last three years exceeds $26,000. The business purchased a Heidelberg press for which both she and Mr. Colby are personal signatories on the note; the remaining indebtedness is approximately $135,000. The note is in default, with interest unpaid to October, 1995. While there was dispute as to the cause of the downturn of fortunes of Direct Images, Inc., there was no suggestion that any willful conduct on the plaintiffs part caused it. It was the plaintiffs position that Direct Images, Inc. faltered because she was investing all of her time and efforts into a donut franchise business the parties had embarked upon in Florida. She was actively involved in that venture in Florida from July, 1992 to February, 1993. At that time, she came back to Connecticut and invested her efforts full-time, again, in Direct Images, Inc.
The chart of sales (Exhibit B) provides a lot of information and was only briefly alluded to during the trial. When the parties married in 1989, Direct Images was in the middle of a banner year; over two years, sales increased 125 %. Significant increases in sales activities continued through 1991. Drops CT Page 4071-L occurred thereafter, bringing sales to a level in 1995 on par with 1988, the year before the marriage. Therefore, sales activities alone show no significant change from the time of the marriage. This is the only indicator the plaintiff put in evidence in regard to her claim that the position of Direct Images, Inc. was grossly changed.
The plaintiff made the business decision to purchase the Heidelberg Press, incurring major debt for Direct Images, Inc. Also, Direct Images borrowed $35,000 from Mr. Colby in early 1992, before the donut business investment. Therefore it, as a business matter, needed money for either cash flow or capital at that early date.
The court finds the premarital agreement between the parties enforceable. The court finds the following assets as having been acquired during the marriage: the LaVallee mortgage valued at approximately $5,000, payable at the rate of approximately $120 per week; the IRAs in the plaintiff's name, valued at $6363, the 2 lots in San Carlo, Florida valued at $20,000 and the Florida `condo' valued at $145,000.00. The court notes that the parties' respective interest in Colby Enterprises, Inc. is a business interest each acquired during the marriage. Further, the court notes that the Covenant Agreement Mr. Colby acquired during the marriage is a business interest acquired by him during the marriage. Finally, the court finds that Mr. Colby's interest in his father's estate is an inheritance received during the marriage.
The court has considered all of the credible evidence and the statutory criteria for the award of alimony and division of the marital estate. (See Conn. Gen. Statutes §§ 46b-81 and46b-82). The court considering case law and statutory criteria (Conn. Gen. Statutes § 46b-62), finds that an award of attorney's fees would undermine these financial orders. Generally, see, Eslami v. Eslami, 218 Conn. 801 (1991).
The court orders:
1. A dissolution of the marriage;
2. No periodic alimony to either party;
3. The plaintiff is the sole owner of the property at 72 Granite Drive, Guilford free of any claim from the defendant; CT Page 4071-M
4. The plaintiff is the sole owner of all of her stock, right, title and interest in and to Direct Images, Inc. free of any claim from the defendant except his assertion of a $35,000 debt;
5. The defendant is sole owner of his entire interest in the Estate of William J. Colby, Sr. free of any claim from the plaintiff;
6. The defendant is the sole owner of his interest in the Covenant Agreement with Aercology, Inc. free of any claim from the plaintiff;
7. Within thirty days, the plaintiff by quit claim deed, shall convey all of her right, title and interest in and to the "Florida condo" to the defendant;
8. The defendant shall, as property settlement, give the plaintiff $60,000.00 within 120 days;
9. Within thirty days, the defendant by quit claim deed shall convey to the plaintiff all of his right, title and interest in and to the San Carlo, Florida lots;
10. The defendant by quit claim deed shall convey to the plaintiff all of his interest in the LaVallee mortgage as of June 1, 1996 and any payments received by him from LaVallee from June 1, 1996 forward shall be forthwith sent to the plaintiff;
11. Each party shall retain ownership of their respective IRAs free on any claim from the other;
12. The defendant shall convey to the plaintiff all of his right, title and interest in and to the 1987 Toyota Corrola;
13. Each of the parties shall retain all other assets listed on their respective financial affidavits, free of any claim of the other;
14. Upon presentation of a full release in favor of him from the lending group for the Heidelberg Press (believed to be CIT Group), the defendant shall release his UCC-1 secured on the inventory and equipment of Direct Images, Inc.; CT Page 4071-N
15. Each party will remain owner of their respective shares of stock in Colby, Inc. subject to their rights and responsibilities under the law;
16. The plaintiff is solely responsible for all debt shown on her financial affidavit and she shall indemnify and hold the defendant harmless regarding the same; and
17. No counsel fees are awarded to either party.
Munro, J.