[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has filed for a dissolution of his marriage with the defendant. This matter has been vigorously contested by the parties. The court heard testimony over the course of twenty-six days of trial. Based upon the evidence presented, the court makes the following findings and issues the following orders.
The plaintiff and the defendant married on September 19, CT Page 4405-T 1970. The plaintiff has continuously resided in the state of Connecticut for at least twelve months prior to bringing this action. The marriage has broken down irretrievably. There were two children born as a result of the marriage both of whom have reached the age of majority.
The plaintiff is fifty years old. He is a licensed and practicing attorney and has been so since 1969. He has an undergraduate degree from the University of Pennsylvania and a law degree from the University of Connecticut. He is currently being treated for clinical depression, migraine headaches and chronic respiratory problems. None of these conditions prevent him from being actively and fully engaged in the practice of law.
The defendant is forty-nine years old. She has an associate's degree from Garland Junior College. She is currently employed as the manager of the campus book store at Hamden Hall Country Day School. The store is staffed by volunteers and there are no other employees. She has held various retail sales positions since 1988 with her employment at Hamden Hall commencing in December of 1993. For a short period of time in the 1980's, the defendant was employed as a real estate agent, but made few sales. For most of the marriage, the defendant was responsible for the care and upbringing of the parties' two children and did not work outside of the home.
The defendant suffers from epilepsy. Her illness is fairly controlled by medication and it does not prevent her from employment.
The parties have had a long term marriage exceeding 25 years. Each blames the other for the collapse of their marriage. The plaintiff states that the breakdown of their marriage was caused by the behavior of the defendant. He claims that she continually demeaned and criticized him in private and in front of others. He also points to a one night sexual relationship that the defendant had with a coworker in 1983 as the beginning of the end of their relationship.
The defendant asserts that disputes would continually arise over the failure of the plaintiff to provide her with sufficient funds to pay household expenses. She also alleges that the plaintiff had an affair with another woman.
The court finds that neither party is singularly at fault for CT Page 4405-U the breakup of their marriage. Both parties engaged in conduct that contributed to the disintegration of their relationship.
The major battleground at trial was the profitability of the plaintiff's present law practice. The work history of the plaintiff prior to 1991, however, was for the most part undisputed. After his admission to the bar in 1969, the plaintiff was associated with his father's law firm of Gamm, Rashba, Liebman and Goldblatt. The plaintiff subsequently acquired an ownership interest in the firm. In 1979, he left and established his own firm, known as Gamm and Gamm, with his father serving as counsel. The firm provided legal services in a variety of areas, including real estate, divorce, commercial law, contracts, probate and estates.
The plaintiff left the independent practice of law in 1983 and became in house counsel at Cheshire Management Company, a real estate management and syndication company. He later assumed the position of vice president in addition to that as counsel. His duties included managing attorneys and real estate projects in thirteen states. The plaintiff's compensation during his employment at Cheshire Management was substantial. During his five years there, his combination of salary and bonuses ranged between $100,000 and $175,000 annually. He also received opportunities to participate in syndication ventures.
At the end of 1987, the plaintiff left Cheshire Management because changes in the tax laws dramatically diminished the opportunities for real estate syndication. For a year and a half, the plaintiff practiced law and invested in real estate. His real estate investments were not successful.
In July 1989, the plaintiff obtained employment with the law firm of Hoberman and Pollack. He was hired to work on real estate matters with the hope of becoming a partner. His annual salary with bonuses was approximately $115,000. He left the firm after one year when he was informed he would not become a partner with the firm.
In August 1990, the plaintiff established his own law firm as a sole proprietorship in North Haven. In June of 1991, the plaintiff hired an associate, David Weiss, to assist him in his law practice. His practice consisted primarily of debtor representation, with foreclosures and workout agreements providing the bulk of the business. The plaintiff converted his CT Page 4405-V law practice to a professional corporation in November 1992.
The parties offered sharply divergent views of the current viability of the plaintiff's law practice. The plaintiff claims that he worked long hours and made little money. The depressed economy in Connecticut resulted in few commercial real estate deals. Many of his clients were forced to file bankruptcy and failed to pay substantial attorney's fees owed him.
The defendant asserts that the plaintiff has had a thriving law practice. The firm's gross income during the years 1991 through 1994 was exceptionally high. Any failure on the plaintiff's part to generate a substantial net income is due to unreported income or to faulty business practices.
Each of the parties presented an expert witness to buttress their claim. The plaintiff's expert, Donald Perlroth, is a certified public accountant. The defendant's expert, Mark Harrison, is a certified public accountant and also an attorney. Each expert reviewed the books and records of the plaintiff's law practice for the years 1991 through 1994.[1]
There was no material dispute between the experts as to the amount of gross income received by the plaintiff. Using the figures compiled by the plaintiff's expert, the plaintiff collected gross incomes of $279,317, $321,019, and $257,345 for the years 1992, 1993, and 1994 respectively.
Their opinions did differ significantly as to net income for those years. Perlroth found an average adjusted net income of approximately $32,000 annually for the years 1992 — 1994. Harrison determined that the average was almost $48,000 per year for the same period. The difference resulted primarily from contrasting views on the allowableness of certain business deductions such as meals, entertainment and auto expenses.
Their opinions diverged even more markedly for the 1991 year. Perlroth found the plaintiff's net income to be $40,687 and Harrison determined it to be $203,250. The primary reason for the difference is that Perlroth treated one fee of $150,000 to be income in 1990 while Harrison concluded that it was income in 1991.
Perlroth and Harrison also disagreed on the net value of the plaintiff's law practice. Perlroth found the practice to have a CT Page 4405-W negative value of between $34,000 and $51,000. Harrison determined that it had a positive net worth of $81,300. The principal reason for the immense disparity was differing views on the collectibility of accounts receivable and the amount of the accounts payable.
The court finds the conclusions of Mark Harrison to be more reasonable and supportable. For example, Perlroth "assumed" that 50% of the plaintiff's expenses for meals and entertainment and 66% of his auto expenses were for business use and deducted them from plaintiff's gross income in determining his annual net income. Harrison concluded that no meals, entertainment or auto expenses could appropriately be deducted from gross income because the plaintiff provided him with no records or documentation to show that any expenses were related to his business. Because he had custody and control of the business records, the burden was on the plaintiff to demonstrate what expenses, if any, were reasonably related to his business.[2]
As another example, Perlroth decreased the account receivable due from Penmar Corporation based in part on the fact that the company's liabilities exceeded its assets. Harrison more appropriately did not reduce the receivable because Penmar was an operating business that was generally paying its bills. In fact, Penmar was paying its bill to the plaintiff, with substantial payments made to him in 1995.
Finally, Perlroth, as the plaintiff's expert witness, testified that in a number of areas he relied on statements made to him by the plaintiff. These areas included the collectibility of accounts receivable and the amount of outstanding expenses, such as rent owed to Sturbridge Square Investors. As detailed infra, I have found the testimony of the plaintiff, particularly as it relates to financial matters, not to be creditable. The opinions of Perlroth have been undermined to the extent of their reliance on the plaintiff's assertions.
The one area most in dispute at trial was the financial condition of the plaintiff's law practice. On this issue, the plaintiff's testimony was consistently not worthy of belief. In preparation for filing for a dissolution and during the course of the dissolution proceeding itself, the plaintiff misrepresented his financial situation and attempted to manipulate his income. The misrepresentations and manipulations include the following: CT Page 4405-X
1. He lied to the court about owing substantial rent for his former office space at Sturbridge Commons. The more credible evidence shows that the rent was bartered in exchange for legal services provided to the manager of the building, John Cellino.
2. The plaintiff admitted that he sold approximately $47,000 worth of stock in 1994. Yet, he could not recall the amount of the net proceeds that he received from the sale or what bills were paid with those proceeds.
3. He misrepresented to the court the amount of the outstanding loan due him from the professional corporation operating his law firm. The 1994 corporate tax return shows his outstanding loan to the professional corporation to be more than $28,000. The financial affidavit filed by the plaintiff with the court in January 1995 reflects an amount owed the plaintiff of approximately $15,000. The plaintiff attempted to explain this discrepancy at trial by testifying that his accountant told him to reduce the amount of the loan because of benefits he had obtained from the corporation. However, the 1994 tax return was signed by the plaintiff and his accountant on October 6, 1995, after the filing of his affidavit with the court.
4. The plaintiff attempted to artificially depress his income in 1994 and 1995 by receiving loan repayments, rather than salary, from his law firm. Prior to 1994, the plaintiff always paid himself a salary. In 1994, his firm generated approximately $54,000 in cash that was available to pay as salary to the plaintiff. The plaintiff gave himself no salary. Instead, he received loan repayments which were not classified as income. As a result, for the first time in years, the corporation incurred taxes because it showed a positive income for the year.
The plaintiff continued the practice of receiving loan repayments and taking no salary in 1995. He testified that the firm could not afford to provide him with a salary yet it was paying a legal assistant an annual salary of $35,000 plus substantial overtime.
5. The plaintiff misrepresented to the court that his recent withdrawals of funds from the trusts established for his two children were used to reimburse him for prior expenses paid on their behalf.[3] The plaintiff testified that in 1993 he began CT Page 4405-Y withdrawing funds from his children's trusts to reimburse himself for expenses he had paid prior to 1992. He had no record of the prior amounts allegedly paid by him on his children's behalf. He also stated that although he was owed additional sums from pre-1992 expenses, he had no intention of reimbursing himself any further.
His testimony is a patent attempt to fashion the facts to best suit his interests. It is in his interest to have the payments constitute reimbursement of prior expenses, rather than payment of current personal expenses. It is in his interest to have the reimbursements cease so that the trust funds are not considered presently available to him. The court finds that the children's trust funds have been used by the plaintiff to pay his own personal expenses whenever he has seen fit to do so.
6. Another example of the plaintiff fashioning facts to suit his needs is his testimony regarding the practice of law after his filing for bankruptcy in June of 1995. On December 19, 1995, in his testimony before this court, the plaintiff stated that he stopped operating as a professional corporation in the summer of 1995. On January 11, 1996, he reiterated his testimony by stating that he changed his practice to a proprietorship after the bankruptcy filing.
On January 17, 1996, the plaintiff testified that he had reflected on his previous testimony and he had been incorrect in stating that he had been practicing as a proprietorship since the bankruptcy. He stated that he had in fact been practicing as a professional corporation. This change in testimony benefitted [benefited] the plaintiff because it allowed him to claim that any new legal work and income and any existing account receivable was the property of the professional corporation which was in the hands of the bankruptcy trustee and not his personally.
This testimony is contradicted by more creditable evidence in the record including the fact that he kept firm income and paid firm bills which should have been the asset and responsibility of the bankruptcy trustee if he was actually working for the professional corporation. The uncontroverted facts also show that, after the bankruptcy filing, the plaintiff changed his stationery from "Attorney John Gamm, P.C." to Attorney John Gamm as a proprietorship and the sign for his new offices did not say "P.C." CT Page 4405-Z
7. The plaintiff had his professional corporation improperly pay wages to the defendant in an effort to increase the defendant's income and reduce the income shown to be generated by his law practice. In 1993 and 1994, the professional corporation deducted as business expenses wages paid the defendant in the amount of $10,000 and $6,000 respectively. The defendant performed no work for these payments. The plaintiff's own expert found these payments to be inappropriate and stated that it was "blatantly incorrect" to deduct them as business expenses.
The most egregious falsehood, one that goes to the very heart of this litigation, is the plaintiff's testimony that he intends to terminate his law practice. On January 12, 1996, after having testified for portions of eight days of trial, the plaintiff disclosed for the first time during redirect examination that he intended to close his law practice and assume responsibility for running a train museum and short line railroad. Although he stated that he would continue to perform some legal work on a contract basis and conduct arbitrations, the clear import of his testimony was that the focus of his professional life would undergo a dramatic change. His income would also fall since the salary he would be receiving for his position with the museum and railroad would be only $15,000 annually. The plaintiff stated that he was making this change primarily for economic reasons.
The plaintiff's testimony was simply not believable. It makes little economic sense for the plaintiff to abruptly terminate a law practice which, according to the findings of the defendant's expert, generated an annual net income exceeding $66,000 in 1993 and $56,000 in 1994. The plaintiff would also have the court believe that rather than relying on his 25 plus years of experience as a lawyer and trading on his well-known family name to reinvigorate his law practice, he has chosen to pursue a career for which he has no experience. He has never run a museum or a railroad. Yet, he claims that this path, with its low initial pay and no future guarantees, makes better financial sense than continuing with his real estate specialty or learning a new area of the law.
The plaintiff's testimony was conclusively revealed as a deception by the subsequent testimony of Melanie Warren, his legal assistant. Warren had been employed by the plaintiff in various capacities since 1983. She directly contradicted the plaintiff's testimony that he had informed her that he was CT Page 4405-AA terminating his law practice.[4] She stated that the first time she learned that the plaintiff was closing his law firm was when she heard his testimony to that effect in court. He never gave her any indication that she might be out of a job or that he was considering taking a position with a railroad. Warren specifically stated that she believed that the plaintiff would have told her prior to his testimony in court about closing his practice if he was really closing it.
The evidence presented at trial demonstrates that the plaintiff's law practice did not fall victim to changing tax laws, a depressed economy and bankrupt clients as suggested by the plaintiff. Although these factors did adversely impact his practice to some degree and his compensation would have been even better had they not occurred, the overriding reason for the limited net income provided in recent years by his law firm was bad business practices.
Both the plaintiff's and the defendant's expert witness agreed that the plaintiff's law firm produced substantial gross income each year. Both experts also opined that the plaintiff's law practice realized an unusually small net income as a percentage of gross income. Both experts questioned the quality of the management practices at the firm.
The court finds that the business practices employed by the plaintiff were seriously substandard. He did not require retainers prior to performing work. He did not render bills after work was performed. He did not undertake any collection efforts prior to writing off bills as uncollectible.
The plaintiff also required no fee retainers and in some cases even advanced costs for clients whose financial situation he knew to be precarious and whose previous bills he had written off as uncollectible. For example, at the end of 1994, the plaintiff wrote off as uncollectible bills worth between $40,000 to $50,000 due from Robert Hartman. Nonetheless, he subsequently represented Hartman with respect to a real estate closing and did not require a retainer in advance. The plaintiff did not get paid his fee of $18,000 for the closing. No bill was ever sent.
Not surprisingly, as a result of his flawed practices, the plaintiff wrote off as uncollectible a substantial amount of his fees. Melanie Warren testified that within the past year the plaintiff wrote off more than $200,000 in fees. CT Page 4405-BB
The plaintiff also failed to maintain adequate books and records of his business. Perlroth testified that, except for check registers, the law firm failed to regularly produce any operating statements or balance sheets or any other records to show income and expenses. Melanie Warren stated that as of September 1994 the bookkeeping was disorganized and its records in disarray. She was unable to determine accounts receivable or differentiate between personal and business expenses. Bank statements were also not reconciled.
The reduced income that the plaintiff has received in recent years is directly attributable to his poor business practices. The plaintiff can and should initiate changes that will restore his annual income to its prior substantial level.
It is well established that in a dissolution action a court may look at the earning capacity of a party in determining its financial awards. Venuti v. Venuti, 185 Conn. 156, 161 (1981);Lucy v. Lucy, 183 Conn. 230, 234 (1981); Miller v. Miller,181 Conn. 610, 611-12 (1980). It is appropriate to look at the plaintiff's earning capacity in this case for a number of reasons.
His employment history shows that he is capable of earning an annual income far greater than his recent record indicates. When employed by others and not in business for himself, he earned compensation substantially greater than $100,000 annually.
Moreover, the plaintiff's seriously flawed business practices when conducting his own law practice have unnecessarily diminished his annual income. Those practices are relatively easy to correct. See Vandal v. Vandal, 31 Conn. App. 561, 567 (1993) in which the appellate court upheld financial awards based on earning capacity where the trial court found that a party could earn more through better business practices.
Finally, if the plaintiff is to be believed, he is voluntarily giving up the full time practice of law. It is particularly appropriate to utilize a party's earning capacity when he has unilaterally decided to limit his income. Miller v.Miller, 181 Conn. 610 (1980) and Hart v. Hart, 19 Conn. App. 91
(1989).
The court finds that the plaintiff has an earning capacity of CT Page 4405-CC $100,000 net income annually. There are three bases for this finding.
First, Mark Harrison stated that, in his expert opinion, the plaintiff has a net earning capacity of "no less than $100,000" per year. His opinion was based on the plaintiff earning $200 per hour and performing between 1,000 and 1,500 billable hours each year. The plaintiff's base hourly rate for 1994 and 1995 was $200 per hour. Harrison also testified that the plaintiff performed in excess of 1,500 billable hours in 1991, 1992 and 1993.
Second, it is reasonable to expect that the plaintiff can earn 50% of his gross income as net income on an annual basis. Harrison stated that the plaintiff's net income should be no less than 50% of his gross income. He based his opinion upon his experience that the usual percentage for attorneys in Connecticut was 50% and upon a 1994 small law firm survey issued by Altman Weil Pensa. The survey showed that the average net income for firms in the United States of one to twelve lawyers was 52.7% of gross income and the average net income for firms in the northeast of two to five attorneys was 52.5%.
For each of the years 1991, 1992, 1993 and 1994, the plaintiff's gross income amply exceeded $200,000 per year.[5]
The implementation of basic changes to his business practices should enable the plaintiff to realize the average net income percentage of 50%.
Third, the plaintiff's earning history demonstrates that he has received compensation well in excess of $100,000 when he has not been self-employed. He received salary and bonuses between $125,000 and $175,000 while employed at Cheshire Management Company and a salary of $115,000 while at Hoberman and Pollack. Should the plaintiff be unwilling or unable to make the rudimentary changes in his business practices necessary to increase the net income from his own law practice, he can seek employment elsewhere that will pay him what his employment record shows he is worth.
The court finds the defendant's net income from her employment to be $299 weekly and from her dividends, interest and investments to be $98 weekly for a total net weekly income of $397. Her income is consistent with the opinion of the plaintiff's expert witness, Jeff R. Blank, Ph. D., as to her employment potential and earning capacity. CT Page 4405-DD
With respect to assets, the plaintiff possesses three individual retirement accounts with a total current value of $81,423. He also has a loan receivable due from his professional corporation which he lists on his financial affidavit as having a present value of $6,800. The court finds, based on the testimony of the defendant's expert witness, that the plaintiff's law practice has a current value of $81,300. The plaintiff also has bank accounts with a current balance totalling $1,100.
The defendant owns a one-half interest in the marital home at 149 Santa Fe Avenue in Hamden. The plaintiff lost his one-half interest as a result of his filing bankruptcy in June, 1995. The court finds the fair market value of the property to be $250,000 and the total net equity to be $170,000.
The defendant also owns a 24% interest in a beach house at 13 West Walk in Clinton. The house was formerly owned by the defendant's mother and was transferred by gift to the defendant, her sister and a trust for their children. The court finds the fair market value of the property to be $300,000 and the defendant's share of the net equity to be $39,000.
The defendant possesses a 25% interest in 367 Oakland Street partnership. The partnership's principal asset is commercial property at 367 Oakland Street, Manchester. The value of the defendant's interest is $25,000.
The defendant also has the following assets: securities in a Prudential account in the amount of $97,000;[6] Travelers stock valued at $4,500; bank accounts in the amount of $5,000; and an individual retirement account worth $8,000.
It is important to note that the plaintiff did not make a significant contribution to the acquisition, preservation or appreciation in value of a number of the assets owned by the defendant. The properties in Clinton and Manchester and the securities in the Prudential account were obtained by the defendant through gifts from her family and, for the most part, maintained separately by her.
The plaintiff claims that the defendant has two additional assets that should be taken into consideration in this dissolution proceeding. The first is a trust fund known as the Ingrid C. Gamm Trust. The trust was established by the CT Page 4405-EE defendant in 1992 through a gift of approximately $100,000 from her mother. The trust has a present value of approximately $122,000. The defendant, together with her mother and two children, is a primary beneficiary of the trust. The trustee is Attorney Marshall Gibson who has sole and absolute discretion in distributing income and principal from the trust for the benefit of the beneficiaries. The trustee has made no distributions to the defendant and has no present intent of doing so.
The court declines to base its financial orders on the value of the Ingrid C. Gamm Trust. The defendant has no control over the distribution to her of income from the trust. She has no vested right to actually receive any funds. Her receipt of funds is in the nature of an expectancy that should not be included in the distribution of property or the award of alimony at this time. See Rubin v. Rubin, 204 Conn. 224 (1987). Whether the defendant will receive any funds and, if so, how much can not presently be determined. Therefore, the preferred procedure is for the court to issue appropriate orders in response to a request for modification if and when the defendant receives income from the trust. Rubin, 204 Conn. at 236.
The plaintiff also asserts that the defendant's residuary interest in her father's estate should be distributed at this time. The defendant has a contingent interest in the Louis Chorches testamentary trust. Although her interest vested upon the death of her father, the defendant's interest will only be realized upon the death of her mother. The value of her interest is uncertain at this time. It is uncertain because insufficient evidence was submitted at trial for the court to determine the trust's value. It is also uncertain because the defendant will receive only those proceeds remaining upon her mother's death. Her mother may outlive her. If not, the value of the estate at the time of her mother's death is unknown. Once again, it is preferable for the court to defer consideration of the effect of the defendant's inheritance on the financial awards until its value can be ascertained with reasonable certainty. See Eslami v.Eslami, 218 Conn. 801 (1991). See also Bartlett v. Bartlett,220 Conn. 372 (1991).
In determining the orders contained herein, I have carefully considered all the relevant statutory criteria, including those contained in Conn. General Statutes § 46b-81 as they relate to the assignment of property and § 46b-82 as they relate to the award of alimony. The court enters the following orders: CT Page 4405-FF
1. The marriage is ordered dissolved on the grounds of irretrievable breakdown.
2. The plaintiff shall pay the defendant periodic alimony in the amount of $2,500 per month. Payment is due by the tenth of every month. Alimony shall terminate upon the remarriage of the defendant, the death of either party or the cohabitation by the defendant in accordance with Conn. General Statutes § 46b-86(b).
3. The plaintiff is not awarded any interest in the marital home at 149 Santa Fe Avenue, Hamden, Connecticut. The defendant is hereby awarded any interest that the plaintiff may have remaining in the property after his bankruptcy filing in June of 1995. The defendant shall hold the plaintiff harmless and indemnify the plaintiff from the first and second mortgages on the property.
4. The defendant shall retain all her interest in the residential property at 13 West Walk, Clinton, Connecticut and in the commercial property at 367 Oakland Street, Manchester, Connecticut. The defendant shall hold the plaintiff harmless and indemnify the plaintiff from any mortgages on the properties.
5. The defendant is not awarded any interest in the plaintiff's law practice, either as a professional corporation or a sole proprietorship, or in the loan receivable due from the law firm.
6. The plaintiff shall retain sole ownership of the individual retirement accounts and bank accounts listed on his financial affidavit.
7. The defendant shall retain sole ownership of the individual retirement account, the bank accounts and the Travelers' stock listed on her financial affidavit.
8. The defendant shall retain sole ownership of the securities in the Prudential account.
9. Each of the parties shall be solely responsible for payment of the liabilities listed on their respective financial affidavits.
10. Each of the parties shall be responsible for their CT Page 4405-GG respective attorney's fees and expert witness fees.
11. The plaintiff shall cooperate in obtaining any life insurance on his life that the defendant wishes to obtain and pay for at her expense, naming her as beneficiary thereof for so long as she is entitled to receive alimony from the plaintiff. The amount of such life insurance shall not exceed $200,000.
12. The plaintiff shall provide the defendant with a copy of his personal federal income tax returns and a copy of any federal income tax returns for his professional corporation and any other entity through which he shall hereafter conduct any business within two weeks of their filing.
13. The personal property of the parties shall be divided equally between them. The Family Relations Office shall be used to mediate any dispute over the allocation of specific items of personal property. To the extent the parties can not reach agreement on the distribution of personal property after mediation by Family Relations, the court shall retain jurisdiction to decide the unresolved issues.
Jon M. Alander, Judge