MARILYN S. ESLAMI *v.* MEHDI S. ESLAMI
(14183)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, JS.

Argued February 13—decision released May 21, 1991

*William L. Tobin,* with whom was *Alvin Rosenbaum,* for the appellant (defendant).

*Maureen D. Dennis,* with whom were *Rosemary E. Giuliano* and, on the brief, *Karen L. Williams,* for the appellee (plaintiff).

SHEA, J. In this action for a legal separation, the trial court found that the marriage of the parties had broken down irretrievably "due to the defendant's intransigence and unwillingness to continue the marriage relationship, as well as his attentiveness to another woman." A decree of legal separation was ordered together with financial orders allocating various assets between the parties and awarding to the plaintiff wife, Marilyn S. Eslami, both periodic and lump sum alimony, medical expenses, life insurance protection and counsel fees. The defendant husband, Mehdi S. Eslami, has appealed, claiming that the court erred with respect to: (1) the admission of testimony of an expert witness called by the wife; (2) the failure to consider the wife's interest as a beneficiary of her deceased father's estate, which had not been settled at the time of trial; (3) the determination of the value of the husband's medical practice, particularly the element of goodwill, and of his total estate; and (4) the award of counsel fees to the wife. We affirm the trial court's decision upon all these issues.

## I

On March 9, 1989, the husband filed a request for disclosure of the identity of any expert witness to be called on behalf of his wife as well as a statement of the "subject matter on which" and the "substance of the facts and opinions to which the expert is expected to testify," as provided by Practice Book § 220 (A) (1).[1] Upon the failure of the wife to respond to his request within thirty days, as required by Practice Book § 228,[2] the husband filed a motion pursuant to Practice Book § 231[3] to compel her to answer his interrogatories. The response of the wife was filed on April 27, 1989, and named a firm of certified public accountants as the expert witness to be called. She stated that the "[v]alue of [the] defend-

[1] Practice Book § 220 (A) (1) provides as follows: "Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of Sec. 218 and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

"(A) (1) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion."

[2] "[Practice Book] Sec. 228. [REQUESTS FOR PRODUCTION, INSPECTION AND EXAMINATION]—RESPONSES TO REQUESTS FOR PRODUCTION; OBJECTIONS

"The party to whom the request is directed or his attorney shall serve a written response within thirty days after the date of certification of service, in accordance with Sec. 120, of the request on the responding party . . . ."

[3] Practice Book § 231 provides: "If any party has failed to answer interrogatories or to answer them fairly . . . the court may, on motion, make such order as the ends of justice require.

"Such orders may include the following:

"(a) The entry of a nonsuit or default against the party failing to comply;

"(b) The award to the discovering party of the costs of the motion, including a reasonable attorney's fee;

"(c) The entry of an order that the matters regarding which the discovery was sought or other designated facts shall be taken to be established

ant's medical practice" would be the subject matter of the expert testimony and indicated that the factual substance of the testimony would be the "[v]alue of said medical practice based upon a review of the financial records of said medical practice." The name of a real estate appraiser who would testify to the value of a building in which the husband held an interest was also furnished and a copy of his report was attached to the response. It was indicated that no report had yet been received from the accounting firm.

At the start of trial on May 2, 1989, the husband filed a motion in limine seeking to preclude any testimony of the witness from the accounting firm engaged by his wife concerning the value of his practice as a radiologist. During argument of the motion it appeared that the attorney for the husband had been present when employees of the accounting firm had examined the husband's financial records and had even scheduled a deposition of the expert witness to be used at trial, which the wife's attorney had cancelled. In response to an inquiry by the court, the husband's attorney replied that he did not intend to seek any depositions.

The court denied the motion in limine "at this point," observing, "I don't think the defendant up to this time has used due diligence in pursuing the matter of the deposition."

On May 24, 1989, three days of testimony having intervened since the denial of the motion in limine, the

for the purposes of the action in accordance with the claim of the party obtaining the order;

"(d) The entry of an order prohibiting the party who has failed to comply from introducing designated matters in evidence;

"(e) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal.

"The failure to comply as described in this section may not be excused on the ground that the discovery is objectionable unless written objection as authorized by Secs. 222, 226, and 229 has been filed."

wife called Arthur Sanders, an employee of the accounting firm, to testify to the value of the husband's radiological practice. His written report, which had not been made available previously, was offered into evidence. The husband thereupon renewed his motion in limine to exclude the report as well as Sanders' testimony. Sanders testified that the delay in preparing his report was attributable to a lack of cooperation on the part of the husband in failing to make pertinent financial records available. The trial court again denied the motion in limine, noting that an order had been issued in October, 1989, for an appraisal of the husband's practice and, "according to the witness, [the husband] failed to abide by that order." The court also declared: "If anybody is playing cat and mouse, it's the [husband]."

The finding of the trial court, which is adequately supported by the evidence, that the principal source of delay in the disclosure of the content of Sanders' testimony was the husband's failure to make his financial records available, greatly undercuts his claim on appeal that the sanction of excluding such testimony should have been imposed on the wife for failure to furnish Sanders' appraisal report earlier than just before he testified. Even if the court had concluded that the wife's answers to the interrogatories were not fully responsive, it would not follow that sanctions should necessarily be imposed. Practice Book § 231 provides that, when there has been a failure to comply with a discovery order, "the court may, on motion, make such order as the ends of justice require," which "may include" one or more of the specified sanctions. It is virtually frivolous for the husband to suggest that the court abused its broad discretion by failing to impose the sanction of excluding testimony because of delay in furnishing the report of an expert witness, after concluding that the delay was largely attributable to the

husband's failure to comply with the order for disclosure of his financial records.

## II

At trial it was undisputed that the wife had a financial interest in the estate of her father, who had died approximately two and one-half years before trial. The estate had not been settled, however, because her brother was contesting the will, and that litigation was still pending. The wife testified that she had already incurred expenses of approximately $73,000 in the will contest, but that she expected to "net out maybe $180,000" from the estate, if the will should be upheld.[4] In making the financial awards, the trial court did not consider the wife's interest in her father's estate, because the value of her interest could not be determined until the pending litigation had been resolved.

In *Rubin* v. *Rubin,* 204 Conn. 224, 232, 527 A.2d 1184 (1987), this court held that a contingent remainder interest in an inter vivos trust held by a spouse did not constitute "property" subject to assignment by the court to the other spouse pursuant to General Statutes § 46b-81 in rendering a judgment dissolving the marriage. We ruled also that evidence of a mere expectancy of receiving an inheritance in the future was inadmissible. See also *Krause* v. *Krause,* 174 Conn. 361, 365, 387 A.2d 548 (1978). In the present case, the interest of the wife in her father's estate had vested upon his death and had ceased to be a mere expectancy. Its value, however, could not be ascertained with certainty because of the unresolved will contest, which continued to generate expenses to be borne by the wife.

---

[4] If the will were not upheld, the estate would be divided among the three children of the decedent, including the wife. She testified that in such event she estimated that her share of the estate would be $80,000, but it is not clear whether this estimate included an allowance for her attorney's fees.

In *Rubin* we mentioned some of the hazards of basing financial awards on expectations or contingencies that ultimately may never be realized wholly or partially. "Relying upon such an illusory order, a court may assume that adequate provision has been made for a needy spouse and neglect to provide more dependable means of support, such as a sufficient periodic alimony order or a greater share of assets owned at the time of the decree." *Rubin* v. *Rubin,* supra, 235. Although the interest involved here had vested in the wife at the time of trial, the court could reasonably have concluded that uncertainty as to the amount she would eventually receive from her father's estate militated against consideration of that interest for the purpose of the financial awards.

The plaintiff's interest in her father's estate, however, is not wholly irrelevant to a fair financial arrangement between the parties. When periodic alimony has been ordered, a substantial change in the financial need or ability of a party provides a basis for modification of such an award, unless such a change was contemplated at the time of the marriage dissolution. General Statutes § 46b-86. In *Rubin* we concluded that the increase in the husband's financial ability that would occur upon his mother's death "would constitute a change of circumstances ordinarily warranting an increase in the weekly alimony payment . . . ." *Rubin* v. *Rubin,* supra, 236. Similarly, in this case, when the value of the wife's legacy or inheritance has been determined, there would be a basis for adjusting the alimony order, unless other circumstances relevant to financial ability or need may have intervened. "Any prediction of what justice between the parties may require when a future event may occur is likely to be less well considered than a determination made after the event, when speculation as to the circumstances involved has

been supplanted by actuality." Id. We conclude that the court did not abuse its discretion in failing to consider the undetermined value of the wife's interest in her father's estate, since the decree was fashioned in such a manner as to allow for modification of the alimony award when the value of her interest becomes ascertainable. It was within the discretion of the court to defer consideration of the effect the wife's inheritance should have on the financial orders until its value was known.

### III

The husband has raised a plethora of claims with regard to the factual findings of the value of certain of his assets that are related to the financial awards. In considering these claims, it must be remembered that our function is not to retry the case or pass upon the credibility of certain witnesses, but to decide only whether the findings under attack are reasonably supported by the evidence. *Doyle* v. *Kulesza,* 197 Conn. 101, 105, 495 A.2d 1074 (1985).

The trial court accepted the valuation of the husband's radiological practice made by the wife's expert witness, Arthur Sanders, a certified public accountant. He arrived at the values of $413,025 for the tangible assets of the practice and a range of $265,807 to $398,710 for the intangible asset of goodwill.

### A

The husband disputes the value Sanders placed on one component of the tangible asset valuation, $289,898 for "machinery & equipment." This figure, according to Sanders' testimony, was calculated on the basis of the original cost of each item reduced by a percentage corresponding to the number of years during which it had been in use and the application of a "dollar con-

verter" for the purpose of adjusting for inflation and eliminating the effect of accelerated depreciation in determining fair market value. The husband objected to the use of the dollar converter because Sanders did not know whether any governmental agency or trade organization had approved the figures used, which he had obtained from a monthly publication of an appraisal company. The schedule of dollar converter factors contained in this publication includes a caveat that they "should not be used in specific cases, as many variables make up the averages indicated. The mix of your plant's physical, functional, and economic condition may produce a very different answer." Sanders testified that this caveat was not applicable to a "medical office which has homogeneous type of equipment." His valuation for the machinery and equipment item was $210,348 higher than the value stated in the husband's financial affidavit.

On appeal the husband claims that the trial court never specifically ruled on his objection to the admissibility of the dollar converter schedule as part of Sanders' report and, therefore, should not have relied on the valuation resulting from its use. It is true that the court reserved its ruling until after the wife's counsel had "elicited [further] testimony from the witness" and that no explicit ruling appears to have been made later. The husband, however, never reminded the court of this oversight during the remainder of the trial. Furthermore, the court implicitly ruled that the dollar converter evidence was admissible by expressly stating in a further articulation of its decision that it had based its valuation of the medical practice on Sanders' testimony.

With respect to the merits of the ruling and the court's reliance on a valuation employing a dollar converter factor, the husband refers to nothing in the tes-

timony critical of such a valuation technique except the caveat previously mentioned. The court was entitled to rely upon its own judgment of the competence and credibility of Sanders in deciding to accept his valuation of the tangible assets based on the use of a factor designed to allow for inflation and the distorting effect of accelerated depreciation in determining fair market value. There is nothing inherently improper in attempting to adjust equipment acquisition costs to current dollar values and to eliminate the distorting effect of depreciation in excess of the actual decline in the useful life of the equipment. Whether the allowances made by Sanders for these adjustments were accurate was a question of fact for the trier.

## B

The husband is also critical of Sanders' use of such accounting techniques as normalization of the income of a business in determining its fair market value by reducing certain expenses to amounts that a reasonably prudent investor would expect to pay for such items. Sanders "normalized" the annual costs of a CAT scanner used in the practice as if it had been purchased outright rather than leased, and concluded that, after allowing for financing expenses and depreciation, the annual lease payments of $134,784 paid for this equipment would have been reduced to $54,200 in 1988, if it had been purchased rather than leased. On this basis the net income of the radiological practice used in calculating the "goodwill" or intangible assets of the practice was increased by $50,584 in 1988. A similar procedure was used to reduce the actual net income of the husband from his practice, $387,594 in 1988, to a "reasonable compensation" level, $186,618 in 1988, based upon a schedule indicating the median earnings of radiologists throughout the nation. The effect of this reduction was to increase substantially the amount of income

presumably attributable to the intangible assets of the practice and characterized as "excess earnings." The income thus claimed to arise from the intangible assets was then capitalized to arrive at a valuation range of $679,000 to $812,000 for the "goodwill" of the practice.

The husband baldly asserts that the normalization of income technique with respect to restructuring the cost of the CAT scanner was improper. No expert testimony critical of this procedure is referred to nor does the husband cite any authority banning its use. He does not challenge the similar procedure of using excess earnings rather than actual earnings in evaluating the intangible assets. We conclude that there is nothing so unreasonable about the method used to restructure the income generated from the practice for the purpose of determining its fair market value as to preclude the trial court from accepting the valuation arrived at by Sanders as a basis for its decision.

## C

The husband also claims that the evidence was inadequate to support a finding that one intangible asset of the practice, goodwill, which Sanders valued at $679,000 to $812,000, had any substantial value, in the absence of evidence of a market for the sale of the practice at a price approximating those figures. He relies upon several cases that have rejected the concept that the goodwill of a profession, such as the practice of medicine, is a divisible marital asset. *Hanson* v. *Hanson,* 738 S.W.2d 429, 435 (Mo. 1987) (professional goodwill in oral surgery practice is a marital asset subject to division, but must be distinguished from future earning capacity and cannot be evaluated by use of capitalization formulae as a substitute for fair market value evidence); *Nail* v. *Nail,* 486 S.W.2d 761, 764 (Tex. 1972) (practice of ophthalmologist is "no more than an expect-

ancy wholly dependent upon the continuation of existing circumstances" and not a marital asset); *Holbrook* v. *Holbrook*, 103 Wis. 2d 327, 351–52, 309 N.W.2d 343 (Wis. App. 1981) (partnership interest of lawyer in goodwill of law firm not subject to division as a marital asset when partnership agreement provided that upon withdrawal a partner would be entitled only to his capital account). In each of those cases the trial court had assigned one half of the value found to represent the goodwill of the husband's practice to his wife.

In the present case no such assignment was made, nor can any of the transfers of property to the wife or other awards ordered by the court be traced specifically to the value of the radiology practice, as distinguished from the husband's other assets or his earning capacity. The court did state that it had considered the "full value" of the practice "in allocating family assets between the parties," in response to the husband's motion for articulation. The practice, however, was only one of nine components that were expressly identified as comprising the husband's gross estate.[5] The prop-

---

[5] In response to an inquiry in the motion for articulation requesting the amount found to be "the gross value of the [husband's] estate" and its "principal components," the trial court responded as follows: "(F) Value consisted of: (1) that contained in the financial affidavit of the defendant; (2) the admission of the defendant to the plaintiff of the value of his interest in the pistachio nut farm located in Iran of $1,000,000.00; (3) sums diverted from his practice (unlisted and unreported to the IRS); (4) monetary and non-monetary (*O'Neill* v. *O'Neill*, 13 Conn. App. 300, 307 [536 A.2d 978 (1988)]) contributions of the plaintiff under General Statutes Section 46b-81; (5) Keogh plan to be listed at $371,870.00 instead of amount in financial affidavit; (6) unreported additional income earned by the defendant in 1988; (7) real estate at 1389 West Main Street between $4,000,000.00 and $4,300,000.00, subject to mortgage of $2,500,000.00 now has 20% interest in unsold condominiums; (8) value of [the] defendant's professional practice and earning capacity of the defendant Diagnostic Imaging Associates as contained in memorandum of decision, page 5, paragraph 7; (9) additional sums contained in financial statements to First Federal Savings and Loan as shown in exhibits on file."

erty ordered to be transferred to the wife consisted of the husband's one half interest in the family home, one half of his twenty percent interest in a medical office building located in Waterbury, and $300,000 in lump sum alimony. According to his own affidavit, the husband's net worth was approximately $1,400,000. The court found it was substantially higher, however, because several assets had been omitted, such as his interest in a pistachio nut farm in Iran, or had been undervalued, such as his radiology practice. The financial awards made by the court appear to have been based on an estimate of the husband's total wealth, enhanced by the value attributed to the element of goodwill, and his future income.

Nevertheless, because the trial court accepted Sanders' estimate of $679,000 to $812,000 for the goodwill of the husband's practice, it is probable that the financial awards to the wife would have been reduced if the court had not included the substantial value it placed on goodwill in calculating the husband's wealth. Accordingly, we must decide whether the goodwill of the husband's practice was properly considered as relevant to the financial awards and whether the capitalization of excess earnings technique was appropriate for determining the value of such goodwill.

It can hardly be doubted that the increment of value, loosely termed goodwill, that arises from the established reputation of a business for the quality of its goods or services may often be found to enhance the value of professional as well as other enterprises by increasing their ability to attract patrons. Relatively few courts have wholly rejected consideration of the goodwill of a professional practice in determining the value of the property held by the parties in a dissolution action. *Powell* v. *Powell,* 231 Kan. 456, 463, 648 P.2d 218 (1982) (medical practice personal to husband

and not subject to division in divorce action); *Nail* v. *Nail*, supra; see 38 Am. Jur. 2d, Good Will § 8. Several courts have recognized that the goodwill of an established practice may have value, but disapprove of the capitalization of excess earnings method of valuation, insisting upon evidence of value based on comparable sales or partnership withdrawal agreements. *Hanson* v. *Hanson*, supra; *Holbrook* v. *Holbrook*, supra. Most courts, however, have approved the capitalization approach to valuation as permissible. *Re Marriage of Hull*, 219 Mont. 480, 712 P.2d 1317, 1322 (1986); *Taylor* v. *Taylor*, 222 Neb. 721, 729, 386 N.W.2d 851 (1986); *Dugan* v. *Dugan*, 92 N.J. 423, 439–41, 457 A.2d 1 (1983); *Hurley* v. *Hurley*, 94 N.M. 641, 644, 615 P.2d 256 (1980); *Re Marriage of Hall*, 103 Wash. 2d 236, 244, 692 P.2d 175 (1984).

We agree with the cases that recognize that goodwill may constitute an element of value distinct from the tangible assets of a medical practice. Its value, however, must be determined on the basis of the price that a willing buyer would pay in excess of the tangible assets to acquire the practice. Obviously, the most persuasive evidence of such value would be prices obtained in comparable sales of similar medical practices, if sufficient information of that kind can be found. We reject the notion that professional goodwill may be evaluated without consideration of the saleability of the practice and the existence of a market for its purchase. See contra *Dugan* v. *Dugan*, supra, 434; *Re Marriage of Hall*, supra, 242. To the extent that the goodwill of the practice cannot be detached from the personal reputation and ability of the practitioner through a sale, it cannot be said to have any significant market value, even though it may enhance the earning power of the practitioner so long as he continues to work in the same community. "[I]f goodwill depends on the continued

presence of a particular individual, such goodwill, by definition, is not a marketable asset distinct from the individual." *Taylor* v. *Taylor,* supra, 731. A valuation method that does not differentiate between the goodwill of the practice as a saleable entity and the practitioner's own earning power as enhanced by such goodwill may well result in counting the same basis for a financial award in dissolution cases twice, once as an asset of his estate subject to allocation and again, as a component of his earning capacity forming the basis for alimony.

In theory, at least, the capitalization of excess earnings method of evaluating goodwill seeks to determine the price a prospective purchaser would pay to acquire the stream of income in excess of the amount he would expect to earn by engaging in the profession through other avenues. In economic terms, if radiologists were so scarce that the demand for such services overwhelmed the supply, there would be little advantage in buying an established practice at a substantial price for the goodwill component rather than establishing a new practice. The supply-demand relationship is theoretically reflected in both components of the capitalization formula, the determination of excess earnings and the capitalization factor. Thus the formula is related to market value, but provides an alternative to the comparable sales method for determining that value. The difficulty lies not in the theory but in its application, particularly with respect to the basis for calculating the amount of excess income and selecting the capitalization rate. Although evidence of comparable sales would ordinarily be more persuasive, we hold that capitalization of excess income is a permissible method for determining the value of the goodwill of a professional practice, despite difficulties in its application. We have previously approved the capitalization of projected net

income as a permissible accounting technique for determining the value of a closely held corporation characterized as a "one-man" business. *Turgeon* v. *Turgeon,* 190 Conn. 269, 272–77, 460 A.2d 1260 (1983).

In the present case, Sanders testified that his objective was to determine the fair market value of the practice. He had obtained information from an organization that "actually monitors practices that are sold, including radiological practices." Seventeen such practices had been sold, including five in Connecticut. These were hospital-based practices, however, and the estimated value of the goodwill was predicated on gross receipts. Applying that method of valuation to the husband's practice would have resulted in a goodwill valuation of "probably double" the range of value determined by the capitalization method.

There were other radiologists in Waterbury, but when Sanders had called the local hospital several times on the pretext of seeking a radiologist who could perform a CAT scan, the only name given to him was that of the husband or the name he used for his radiology practice, Diagnostic Imaging Associates. Sanders testified that most of the patients who sought the husband's services had been referred by other doctors and that the close personal relationship likely to develop between a patient and treating physician, such as a pediatrician or obstetrician, was less prevalent in the practice of radiology. Another radiologist intending to purchase the husband's practice would probably be able to retain "at least 90 to 95 percent of the practice," provided that the husband worked a period of three to six months with the successor so that referring physicians would become acquainted with him. If the sale were made to the radiologist presently associated as an employee with the husband, a substantial portion of the gross earnings could readily be transferred.

From this testimony the trial court could reasonably have concluded that there was an element of goodwill in the husband's practice that was saleable to other radiologists seeking to increase their income, that such a buyer could make reasonable arrangements relating to the transfer that would assure the retention of most of the volume of business being presently transacted, and that the relatively limited market for the sale of such a practice was fairly reflected in the modest capitalization factors of 1.5 and 2 used by Sanders to make his valuation. In relying on this testimony, the court did not exceed the bounds of its discretion as trier of the facts.

## D

The remainder of the husband's attack on the valuation of his assets is related to the court's itemization[6] of the "gross value of the [husband's] estate" and "the principal components of said estate," as requested in the husband's motion for articulation. The court never determined the total value of the estate, but simply listed items comprising the estate, some of which were valued specifically and others simply identified without stating values. No further motion to clarify this response was filed nor was any motion for review presented to this court. See Practice Book § 4054.

As one item of such "gross value," the court referred to "the admission of the [husband] to the [wife] of the value of his interest in the pistachio nut farm located in Iran of $1,000,000." Apparently the only basis for this response was the testimony of the wife that during a visit to Iran "prior to the fall of the Shah," her husband "wanted to sell [the farm] for over a million dollars at that time." The husband contends that the "cataclysmic social, political and religious upheaval in

---

[6] See footnote 5, supra.

Iran" that has occurred since their visit renders this basis for a current valuation of his interest in the Iranian farm quite problematic.

When the husband testified, however, although he had retained his Iranian citizenship after he had become a United States citizen and although members of his family continued to live on the farm, he gave no opinion as to its value, having failed to mention the farm in his financial affidavit. We do not regard the court's reference to the husband's admission, however, as a finding of the present value of his interest in the farm, but rather as an indication that it had substantial value. The court was justified in drawing at least that inference from the failure of the husband to produce some evidence of the value of his interest in the farm to contradict the effect of his wife's testimony.

Another item found by the court to constitute part of the husband's gross estate was his Keogh plan retirement account, which was valued at $371,870 instead of $267,467, as stated in his financial affidavit. The difference of $104,403 is attributable to the allowance made in the affidavit for an accrued income tax liability. The motion for articulation, however, sought the "gross value" of the husband's estate as found by the court, not its net value. Accordingly, the court's valuation of the retirement account without allowing for taxes was an appropriate response to the inquiry and was consistent with its valuation of the other items, which are listed at gross values without allowing for taxes.

The remaining claims of error with respect to the valuation of the husband's assets do not warrant further discussion because they are without merit.

## IV

The trial court, in addition to its other orders, awarded the wife $25,000 for counsel fees and also

directed the husband to reimburse her for expert witness fees totaling $23,230. The husband contests these awards on the ground that the wife had substantial liquid assets that were adequate for the payment of these expenses, when the value of the assets listed in her financial affidavit is combined with the value of the financial awards.

The court is authorized by General Statutes § 46b-62 in an action for dissolution of marriage to "order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82." The criteria referred to are those that also govern awards of alimony: "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties" and also *any assignments of property made pursuant to General Statutes § 46b-81.* General Statutes § 46b-82. It is clear, therefore, that the court must consider the effect of its other financial orders in awarding counsel fees.

In *Koizim* v. *Koizim,* 181 Conn. 492, 501, 435 A.2d 1030 (1980), we declared that "[w]here, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so." The husband claims that *Koizim* precludes the award of counsel fees in this case because the plaintiff's affidavit showed approximately $95,000 of bank deposits and securities, which, when added to the $300,000 lump sum alimony award, would be sufficient to pay these expenses. The total sum of the wife's liabilities as shown in her affidavit, however, was $70,650, including $42,000 for counsel fees incurred before trial. An additional $32,000 was sought as counsel fees incurred dur-

ing the trial. The $300,000 award, nevertheless, would be more than adequate to pay the wife's liabilities and litigation expenses.

If inability to pay one's own counsel fees were the only circumstance justifying an award, it is clear that the wife would not qualify. In *Arrigoni* v. *Arrigoni*, 184 Conn. 513, 519–20, 440 A.2d 206 (1981), we clarified *Koizim* by stating that "we did not mean to imply that no allowance should be made if a party has sufficient cash to meet an attorney's bill," pointing out that *Koizim* was based on the circumstance that the recipient of the counsel fee award had " '*ample* liquid funds.' " (Emphasis added.) "If . . . the trial court concludes, based on the total financial resources of the parties, that denying an award of counsel fees would undermine its prior financial orders, then it may award counsel fees to the requesting party." *Fitzgerald* v. *Fitzgerald,* 190 Conn. 26, 34, 459 A.2d 498 (1983). In this case the court explicitly stated that "[t]he award of counsel fees is justified and any denial would be an abuse of discretion by substantially undermining her other awards."

Since the trial court fashioned the other financial awards, it was uniquely qualified to determine whether those awards would be undermined by rejecting the wife's request for counsel fees and expenses. All the awards were made at the same time and were predicated on the assumption that the total of all the awards regardless of the items to which they were apportioned, was reasonable in the light of the respective financial abilities of the parties and the criteria set forth in § 46b-82. The evidence in this case, which includes a thirty year marriage, substantial continuing medical expenses because of the wife's poor health, the clear responsibility of the husband as the cause of the marital breakdown, and the great disparity in the income

and assets of the parties, provides adequate support for the court's conclusion that an appropriate allowance for counsel fees and litigation costs should be made so that the other orders would not be undermined.

The judgment is affirmed.

In this opinion the other justices concurred.