******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JILL GILBERT CALLAHAN *v.* JAMES CALLAHAN
(AC 34936)
(AC 36617)

Beach, Mullins and Schaller, Js.

*Argued December 10, 2014—officially released May 5, 2015*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Munro, J.)

*Campbell D. Barrett*, with whom were *Jon T. Kukucka* and, on the brief, *Kathleen E. Scelfo*, for the appellant in AC 34936 and the appellee in AC 36617 (defendant).

*Daniel J. Klau*, with whom, on the brief, was *Frank A. Sherer III*, for the appellee in AC 34936 and the appellant in AC 36617 (plaintiff).

*Opinion*

SCHALLER, J. These two appeals arise out of the judgment dissolving the marriage between the defendant, James Callahan, and the plaintiff, Jill Gilbert Callahan, and from the court's decision granting the defendant's motion to open the dissolution judgment and entering substitute financial orders based upon its finding that the plaintiff's postjudgment misconduct significantly reduced the value of companies owned by the parties.[1]

In AC 36617, the plaintiff claims that the court lacked jurisdiction to open the original May, 2012 judgment of dissolution.[2] In AC 34936, as amended, the defendant claims that (1) the court improperly awarded the plaintiff alimony from income generated by the companies plus a portion of the value of the companies, constituting impermissible "double dipping," and (2) the court abused its discretion by ordering him to purchase the plaintiff's interest in the companies.[3] We agree with the plaintiff's claim that the court did not have authority to open the dissolution judgment and, accordingly, reverse the judgment entering substitute financial orders and remand the case with direction to reinstate the May, 2012 financial orders. We otherwise affirm the dissolution judgment.

The following facts and procedural history are relevant to our resolution of the present appeals. The parties were married in 1987, and raised three children, all adults at the time of trial. The parties are college graduates and, from 1981 through August, 1992, maintained employment in New York City and London. Once the parties' third child was born, the plaintiff stopped working outside of the home and remained a full-time homemaker until 1994, when the parties decided to start their own business.

In 1995, the parties created three companies: Pentalpha Group, LLC, Pentalpha Funding, LLC, and Pentalpha Capital, LLC (companies). The plaintiff owns 51 percent of each of the three companies, and the defendant has a 49 percent ownership interest in each entity. A related fourth entity, Pentalpha Surveillance, LLC, is owned entirely by the defendant. In September, 2009, the plaintiff formally resigned from her position with the companies. The parties separated at this time, and the plaintiff moved out of the marital home with the parties' children. The plaintiff then filed a complaint seeking a dissolution of her marriage to the defendant, alleging that their marriage had broken down irretrievably.

The matter was tried to the court, *Munro, J.*, on various days between March 1, 2012, and March 14, 2012. During the dissolution proceedings, Barry S. Sziklay, the plaintiff's forensic valuation expert, testified that, as of June 30, 2011,[4] the value of the companies

was not less than $11,747,660. Closing arguments were heard on April 3, 2012. On April 16, 2012, the plaintiff made a single prejudgment withdrawal in the amount of $157,440 from a company bank account.

On May 8, 2012, the court, by way of memorandum of decision, rendered judgment dissolving the parties' marriage on the ground of irretrievable breakdown. The court concluded that "the valuation methodology and adjustments utilized by [Sziklay] represent a sound and reasonable approach to valuation." The court, accordingly, adopted the expert opinion of Sziklay as to the value of the companies.

The court also issued financial orders in connection with the dissolution of the parties' marriage. At the time the court issued its financial orders, the companies retained $6 million in cash assets, which had accrued to this level since the parties' member distributions in May, 2010.[5] The court ordered that the plaintiff transfer to the defendant all of her right, title, and interest to the companies within sixty days. Coincident therewith, the court ordered the defendant to sign a promissory note secured by the stock and accounts of the companies for $6 million payable to the plaintiff, at the rate of $1 million per year for six years. The order further provided that, if the defendant elected to sell the companies within six months, then he was to pay the plaintiff 55 percent of the sale proceeds, and the plaintiff was to receive no less than $4 million from the sale. Execution of the financial orders regarding the companies was stayed pending resolution of the defendant's appeal. See Practice Book § 61-11 (a).[6] Subsequently, the court, *Munro, J.*, denied the plaintiff's motion for termination of stay of execution. See Practice Book § 61-11 (e). Additionally, the court ordered the defendant to pay the plaintiff $60,000 per month in alimony until the death of either party, the remarriage of the plaintiff, or as determined by the court, pursuant to General Statutes § 46b-86 (b).[7]

On May 19, 2012, the plaintiff made two postjudgment withdrawals from company accounts in the amounts of $473,490.81 and $1842. The plaintiff's three withdrawals from the companies' bank accounts totaled $632,772.81. All of these sums were deposited into the plaintiff's personal bank account.

On June 13, 2012, the defendant filed a postjudgment motion for contempt, alleging that the plaintiff had failed to comply with the court's orders. On June 15, 2012, the defendant filed a second motion to open the judgment of dissolution and attendant financial orders based on the plaintiff's unauthorized prejudgment and postjudgment withdrawals from company accounts.[8] On August 17, 2012, the defendant filed AC 34936 challenging the May, 2012 dissolution judgment and attendant financial orders as well as the court's subsequent decisions denying his first motion to open the dissolu-

tion judgment and his motion to reargue. See footnote 8 of this opinion.

On November 6, 2012, the court granted the second motion to open, reasoning that "[i]t would be patently unfair and inequitable to leave the court's judgment orders in place if the defendant's unrebutted assertion of substantial injury to the [companies] has resulted from the plaintiff's unilateral and inappropriate appropriation of [company] funds for noncorporate purposes." The court did not find the plaintiff in contempt, but it ordered her to "replace [by November 27, 2012] all the moneys removed by her, in good funds, to the account(s) from which the funds were removed, plus 5 percent simple interest from the date of taking to the date of repayment." The court ordered an evidentiary hearing to "be held, after court-supervised appropriate discovery, to provide such evidence as is necessary for the court to . . . enter new financial orders, as may be necessary, that take into account the plaintiff's unauthorized withdrawal of funds from [the companies]." The court also determined "that since other conduct of the plaintiff had ensued regarding the companies, the hearing would include all such conduct adversely affecting the value of the businesses and the resulting financial orders up until the actual date of the hearing."

The evidentiary hearing took place over several dates in November, 2013. The court considered, inter alia, the following actions by the plaintiff: (1) her postjudgment failure to properly replace the funds to the company account until November 12, 2013, "a year after they were ordered returned"; (2) holding herself out as president of the companies via her business LinkedIn networking account to communicate postjudgment with a customer of the companies; (3) her refusal to approve a minor change to an operating agreement and her refusal to sign a prepared affidavit of compliance regarding subpoenas addressed to the companies; (4) her decision to bring a federal lawsuit against the auditor of the companies; (5) her provision of confidential information regarding the companies to her counsel representing her in the federal lawsuit and to her life coach; and (6) her postjudgment attempt to access company account information at Chase Bank, which resulted in the bank freezing the companies' accounts. The court excluded evidence offered by the plaintiff that pertained to how the defendant's conduct affected the diminution in value of the companies.

At the evidentiary hearing, both parties presented expert testimony as to whether the plaintiff's conduct adversely affected the value of the companies. The defendant's expert, Mark Harrison, a certified public accountant and an attorney, opined as to the current value of the companies, as extrapolated from the court's findings to the date of the hearing. Harrison relied upon the court's finding in its May, 2012, decision that the

report authored by Sziklay was credible. Alan Schachter, the plaintiff's expert forensic certified public accountant, was retained to rebut the opinions of the defendant's expert, but not to provide an opinion as to the value of the companies.

In a written memorandum of decision dated February 25, 2014, the court found that the value of the companies had been significantly reduced to $6,336,734 as a result of the plaintiff's actions. The court specifically found that: "[The defendant's] ability to control and manage [the companies] has been substantially undermined by the continuous deleterious conduct of the plaintiff." In arriving at the new valuation, the court found that the reduction in value was "wholly related to all of the combined conduct of the plaintiff . . . ." The new valuation reflects a $5,410,926 diminution in the valuation of the companies as compared to the June, 2011, figure of $11,747,660.

The court concluded further that a new trial on the financial orders was not necessary, and that the appropriate remedy was to issue substitute financial orders.[9] The substitute financial orders were entered "in lieu of and replace[d] all of the orders in the original memorandum of decision regarding ownership of [the companies] and payment therefor." The court ordered, inter alia, a reduction in the amount that the plaintiff was to receive for her interest in the companies from $4 million to $3 million. The award of interest in the companies to the plaintiff was "made contingent on her cooperating behavior so that the defendant is able to realize either the income or the value that [the companies] can produce to pay the plaintiff her court ordered share."

On March 7, 2014, the plaintiff filed AC 36617, challenging the court's decision opening the dissolution judgment and modifying the financial orders regarding the companies. On April 7, 2014, the defendant amended AC 34936 to additionally challenge the court's opening of the judgment and its modification of the financial orders regarding the companies.[10] Additional facts will be set forth as necessary.

I

AC 36617

The plaintiff claims that the court lacked jurisdiction to open the May, 2012 dissolution judgment to revalue the companies based on postjudgment misconduct by the plaintiff. The plaintiff specifically argues that "a trial court does not have jurisdiction to open a judgment based on a party's postjudgment conduct." We agree.

We first address the applicable standard of review. "Whether a court retains continuing jurisdiction over a case is a question of law subject to plenary review. . . . Whether a court properly exercised that authority, however, is a separate inquiry that is subject to review only for an abuse of discretion." (Internal quotation

marks omitted.) *Lehn* v. *Marconi Builders, LLC*, 120 Conn. App. 459, 462–63, 992 A.2d 1137 (2010).

A motion to open a judgment is governed by General Statutes § 52-212a and Practice Book § 17-4. Section 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ." Practice Book § 17-4 states essentially the same rule.[11] As the court recognized in its November, 2012 memorandum of decision, "neither § 52-212a nor Practice Book § 17-4 specify the standard for opening a judgment within four months of its rendering." Thus, the basis on which our trial courts can permissibly open a judgment is limited by legal interpretation of the relevant statutes. Our courts, recognizing the important consideration of finality of judgments, have limited the circumstances in which a court may open a judgment within four months of its rendering to where there is "a good and compelling reason for its modification or vacation." (Internal quotation marks omitted.) *Cockayne* v. *Pilon*, 114 Conn. App. 867, 868–69, 971 A.2d 732 (2009).

Before reaching the parties' arguments on appeal, we note that our courts have no inherent power to transfer property from one spouse to another in a marital dissolution proceeding. See *Rubin* v. *Rubin*, 204 Conn. 224, 228–29, 527 A.2d 1184 (1987). Instead, that power rests upon an enabling statute, General Statutes § 46b-81 (a). Section 46b-81 (a) provides in relevant part: "At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . ." Critically, under § 46b-81 (a), "the court does not retain continuing jurisdiction over any portion of the judgment that constitutes an assignment of property." (Internal quotation marks omitted.) *Schorsch* v. *Schorsch*, 53 Conn. App. 378, 385, 731 A.2d 330 (1999). The court's authority to distribute the personal property of the parties must be exercised, if at all, at the time that it renders judgment dissolving the marriage. "Therefore, a property division order generally cannot be modified by the trial court after the dissolution decree is entered, subject only to being opened within four months from the date the judgment is rendered under . . . § 52-212a." (Internal quotation marks omitted.) Id.

"Although the court does not have the authority to modify a property assignment, a court, after distributing property, which includes assigning the debts and liabilities of the parties, does have the authority to issue postjudgment orders effectuating its judgment." (Internal quotation marks omitted.) *Fewtrell* v. *Fewtrell*, 87 Conn. App. 526, 531, 865 A.2d 1240 (2005). This court has

explained the difference between postjudgment orders that modify a judgment rather than effectuate it. "A modification is [a] change; an alteration or amendment which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact. . . . In contrast, an order effectuating an existing judgment allows the court to protect the integrity of its original ruling by ensuring the parties' timely compliance therewith." (Internal quotation marks omitted.) *O'Halpin* v. *O'Halpin*, 144 Conn. App. 671, 677, 74 A.3d 465, cert. denied, 310 Conn. 952, 81 A.3d 1180 (2013). Having set forth our standard of review and the relevant legal principles that guide our analysis, we now consider the parties' arguments on appeal.

The plaintiff specifically contends that a postjudgment change in the value of a marital asset does not constitute a valid ground for opening a judgment, and that the "case law makes clear that the reasons why a trial court may open a judgment must relate to *pre*-judgment conduct." (Emphasis in original.) The plaintiff further argues that, in the present case, the court did not have jurisdiction to open the judgment based on her prejudgment withdrawal of $157,440, because (1) the court considered collectively the prejudgment withdrawal and the postjudgment withdrawals made by the plaintiff in deciding to open the judgment, and (2) given the admission of the defendant's expert that the prejudgment withdrawal had no material impact on the value of the companies, it "could not constitute a 'strong and compelling' [reason] for opening a judgment under . . . § 52-212a or Practice Book § 17-4 (a)."

The defendant responds that the court acted within its discretion in finding that the plaintiff's misconduct warranted the opening of the dissolution judgment. The defendant argues that "[t]here is no prohibition in any of Connecticut's statutes, case law, or rules [of] practice that prevent a court from opening a judgment because of events that occur after a judgment has been rendered." Further, the defendant argues that this court should not "create an exception to the unambiguous, well-established rule that it is within the discretion of the trial court to open a judgment where, within four months of the issuance of the original judgment, it determines that there is good and compelling reason for its modification or vacation."

As a threshold issue, we conclude that the defendant complied with the mandates of § 52-212a and Practice Book § 17-4 by filing his motion to open within four months of the issuance of the dissolution judgment. The court issued a memorandum of decision dissolving the parties' marriage on May 8, 2012. The relevant motion to open was filed by the defendant on June 15, 2012. Because the defendant's motion to open was filed within four months of the issuance of the dissolution

judgment, the court clearly had jurisdiction to modify the judgment, provided that the ground for opening the judgment was a proper basis for exercising jurisdiction.

In determining whether the court properly opened its judgment of dissolution and issued new financial orders, it is necessary to consider the court's reasoning. In its November 6, 2012 memorandum of decision, the court, *Munro*, *J.*, ordered a hearing on the defendant's motion to open "to provide such evidence as is necessary for the court to . . . find such facts as are necessary to enter new financial orders, as may be necessary, that take into account the plaintiff's unauthorized withdrawal of funds from [the companies]." The court reasoned that "[it] would be patently unfair and inequitable to leave the court's judgment orders in place if the defendant's unrebutted assertion of substantial injury to [the companies] has resulted from the plaintiff's unilateral and inappropriate appropriation of [company] funds for noncorporate purposes." The court thus ordered an evidentiary hearing so that the parties could present the court with additional evidence as to events that occurred both before and after the judgment. After hearing evidence and determining it was appropriate to open the judgment, the court, on February 25, 2014, entered new financial orders "in lieu of and replac[ing] all of the orders in the original memorandum of decision regarding ownership of [the companies] and payment therefor."

We agree with the plaintiff that, in the present case, because the opening was premised on considering postjudgment conduct, the court did not have authority to open the judgment. In addition to considering her prejudgment conduct, the court improperly considered the postjudgment withdrawals made by the plaintiff. Neither party has identified precedent wherein the trial court opened a marital dissolution judgment to revalue an asset subject to equitable distribution on the basis of postjudgment conduct by one of the parties. As the plaintiff's counsel noted at oral argument before this court, "not one single case has been cited by [the defendant] in which a court has opened a judgment based on conduct that occurred after the judgment," and our review of the case law has uncovered no such authority. Further, neither § 46b-81 nor any other closely related statute vests the trial court with authority to revisit a judgment dividing marital property where postjudgment conduct, conditions, or changes affect the value of a marital asset.

It is apparent from our review of the record that the court considered the plaintiff's postjudgment withdrawals in granting the defendant's motion to open the judgment.[12] Two of the three withdrawals made by the plaintiff occurred postjudgment, totaling $475,332.81. The plaintiff's single prejudgment withdrawal in the amount of $157,440 was relatively insignificant, consid-

ering the court's finding that, at the time of the dissolution judgment, the companies retained $6 million in cash assets, and its reliance on the plaintiff's expert, Schachter, that "the [total] withdrawal of $632,773 was de minimus in comparison to the cash position of [the companies] at the time." The record further reveals that the court, in arriving at the new valuation for the companies, found that the reduction in value was "wholly related to all of the combined conduct of the plaintiff. . . ."

Here, the court did not have authority to modify the division of marital property once the judgment of dissolution became final on May 8, 2012. The court's decision to grant the defendant's motion to open, and its entry of substitute financial orders in response to the plaintiff's postjudgment misconduct, cannot fairly be construed as seeking an effectuation of the original judgment. The court did not issue substitute financial orders to "protect the integrity of its original ruling by ensuring the parties timely compliance therewith"; (internal quotation marks omitted) *O'Halpin* v. *O'Halpin*, supra, 144 Conn. App. 677; because the substitute financial orders were entered "in lieu of and replace[d] all of the orders in the original memorandum of decision regarding ownership of [the companies] and payment therefor." Rather, in ordering a postjudgment evidentiary hearing to gather new evidence with respect to the extent of the plaintiff's misconduct, the court "introduce[d] new elements into the details . . . but [left] the general purpose and effect of the subject-matter intact." (Internal quotation marks omitted.) *O'Halpin* v. *O'Halpin*, supra, 677. Thus, we conclude that the court's postjudgment ruling modified rather than effectuated the original property distribution. Under these circumstances, the trial court exceeded the scope of its authority by opening the judgment to modify its financial orders based on the plaintiff's postjudgment misconduct.[13] We, accordingly, reverse the judgment of the trial court and reinstate the May, 2012 financial orders in their entirety.

II

AC 34936

As noted, the defendant claims with regard to the May, 2012 dissolution judgment that the court (1) improperly awarded the plaintiff alimony from income generated by the companies plus a portion of the value of the companies, constituting impermissible "double dipping," and (2) abused its discretion by ordering him to purchase the plaintiff's interest in the companies. We disagree.

"The standard of review in family matters is well settled. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts pre-

sented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Gervais* v. *Gervais*, 91 Conn. App. 840, 843–44, 882 A.2d 731, cert. denied, 276 Conn. 919, 888 A.2d 88 (2005). We now address the merits of the defendant's claims in turn.

A

The defendant first claims that the court improperly awarded the plaintiff alimony from income generated by the companies plus a portion of the value of the companies, which constituted impermissible "double dipping." The defendant specifically argues that it was improper for the court to take into account the value of the companies in both the property division and the award of alimony, "because the income generated by [the defendant's 100 percent] ownership interest in the companies was counted in determining [the defendant's] resources for purposes of alimony where the court had also awarded the plaintiff nearly 50 percent of the value of the companies." We are not persuaded.

In ordering the defendant to pay the plaintiff $60,000 per month in alimony pursuant to General Statutes § 46b-82, the court stated the following: "The alimony order is predicated on earnings, including member distributions to the defendant of up to $2,000,000 per year. The court notes that the plaintiff's valuation expert, Sziklay, concluded that a comparable compensation for the defendant, as a key person operating on Wall Street, would be at least in the $1 million to $2 million range annually. Ultimately, in the valuation model that he used, Sziklay attributed 50 percent of the pretax profits to the defendant. For 2010, that resulted in adjusted compensation of $1,976,312. As of the second quarter's completion for 2011, that adjusted compensation attributed to the defendant was $684,880. The defendant provided no contrary evidence. The court finds this approach reasonable. No evidence was adduced of any increase in liabilities. Accordingly, finding earnings attributable to the defendant in the amount of $2,000,000 gross is conservative, the court adopts it as a finding of fact as to the present earning capacity of the defendant at [the companies]."

On appeal, both parties agree with the general princi-

ple that a court may not take an income producing asset into account in its property division and also award alimony based on that same income. See, e.g., *Eslami* v. *Eslami*, 218 Conn. 801, 815, 591 A.2d 411 (1991) (suggesting it is improper for court to "[count] the same basis for a financial award in dissolution cases twice, once as an asset of his estate subject to allocation and again, as a component of his earning capacity forming the basis for alimony"). The parties disagree, however, as to whether the court made a factual finding regarding the defendant's general earning capacity and, if so, whether such a finding was supported by the evidence and the pleadings in the whole record. See, e.g., *D'Amato Investments, LLC* v. *Sutton*, 117 Conn. App. 418, 426, 978 A.2d 1135 (2009).

The defendant argues that the court did not make a finding regarding his general earning capacity and, rather, only determined what his earning capacity was at the companies. The defendant distinguishes the present case from *McRae* v. *McRae*, 129 Conn. App. 171, 187, 20 A.3d 1255 (2011),[14] because the defendant's alimony obligation in the present case "was based on his capacity to earn income at [the companies]" rather than his capacity to earn income independent of his ownership of a business entity. Further, to the extent that the court concluded that the defendant's earning capacity was independent of the income generated by the companies, the defendant argues that such a finding was clearly erroneous. According to the defendant, "the record does not contain any evidence demonstrating that [the defendant] has an earning capacity of $2,000,000 per year payable from any source other than the companies," nor did the court "have any evidence or testimony before it concerning [the defendant's] earning capacity." At oral argument before this court, the defendant noted that the testimony of Sziklay regarding his present earning potential on Wall Street was stricken by the trial court because the defendant argued that Sziklay had not been disclosed as an expert in that capacity.

The plaintiff responds that the court found the defendant's general earning capacity, not limited to his capacity with respect to his position at the companies. Relying on the portion of the court's May 8, 2012, memorandum of decision which details the defendant's Wall Street experience, the plaintiff specifically contends that "the trial court found that the [defendant], given his background, experience and qualifications, had an earning capacity of at least $1–2 million, irrespective of his income from [the companies]." The plaintiff further argues that "[there] is nothing legally improper about a trial court using a spouse's income generated from a closely held business as some evidence of his earning capacity in general, which is what the trial court did in this case" and in *McRae* v. *McRae*, supra, 129 Conn. App. 187. We agree with the plaintiff.

Our review of the record leads us to conclude that the court made its factual finding regarding the defendant's earning capacity independent of his employment at the companies. As noted, the court predicated its alimony order upon its factual finding that "the present [gross] earning capacity of the defendant at Pentalpha" was $2 million per year, conservatively. The record contains additional evidence that the court credited, however, in fashioning its order of alimony. Specifically, the court noted that Sziklay's approach to valuation was "reasonable." In his report, Sziklay "concluded that a comparable compensation for the defendant, as a key person operating on Wall Street, would be at least in the $1–2 million range annually." The record further reveals that the court was presented with evidence with respect to the defendant's educational background and his employment history prior to commencing his work at the companies in 1995, which included various positions on Wall Street and in London. Accordingly, we conclude that the court's finding regarding the defendant's capacity to earn income independent of his position was supported by evidence in the record. See *Gervais* v. *Gervais*, supra, 91 Conn. App. 843–44. Because we are not left with "the definite and firm conviction that a mistake has been committed"; (internal quotation marks omitted) id., 844; we conclude that the court acted within its discretion in awarding alimony to the plaintiff under the facts of the present case.

B

The defendant also claims the court abused its discretion by entering an order that effectively obligated him to purchase the plaintiff's interest in the companies for $6 million, because both parties had requested that the court direct the sale of the companies in their proposed orders. We disagree.

The following additional facts are relevant to our discussion. In her proposed financial orders, the plaintiff asked the court to require the defendant to run the companies. The defendant argued that the companies should be sold, but he requested that the court appoint an entity to sell the companies. Subsequently, the plaintiff amended her proposed orders, requesting that the court order the parties to sell the companies.

On May 8, 2012, the court ordered that the plaintiff transfer to the defendant all of her rights, title, and interest to the companies. In exchange, the court ordered the defendant to sign a promissory note, secured by the stock and accounts of the companies, requiring him to pay the plaintiff $1 million per year for six years for her share in the companies. The order further provided that, if the defendant elected to sell the companies within six months from the dissolution judgment, then he was to pay the plaintiff 55 percent of the sale proceeds, and the plaintiff was to receive

no less than $4 million from the sale.

On appeal, the defendant argues that "[by] awarding [ownership of] the companies to [the defendant], the court ruled on a claim that the plaintiff withdrew when she submitted her operative proposed orders requesting the sale of the companies." The defendant reasons that if he is unable to sell the companies, the court's order will "[force him] to continue operating [the companies] and to deplete the companies' resources to pay the plaintiff [$6 million]." The defendant also argues that if he is able to sell the companies, he will be "solely responsible for any taxes due upon sale" because the plaintiff was ordered to transfer ownership to him prior to the occurrence of any sale. In so arguing, the defendant relies on *Kavanah* v. *Kavanah*, 142 Conn. App. 775, 782, 66 A.3d 922 (2013) (holding that trial court abused discretion in sua sponte ordering parties to pay $5000 in fees to guardian ad litem where prior order establishing that fees would be paid by state was not challenged in any way by parties), and *Gaffey* v. *Gaffey*, 91 Conn. App. 801, 804 n.1, 882 A.2d 715 ("The [trial] court is not permitted to decide issues outside of those raised in the pleadings. . . . Additionally, it is well established jurisprudence that the pleadings serve to frame the issues before a trial court." [Internal quotation marks omitted.]), cert. denied, 276 Conn. 932, 890 A.2d 572 (2005).

The plaintiff argues that the court "acted within its discretion when it gave the defendant the option to keep [the companies] or sell them." Specifically, the plaintiff argues that the defendant's claim is without merit because it is based on a faulty analogy, "that a party's proposed financial orders are legally equivalent to claims for relief alleged in a complaint." The plaintiff further contends that this court "has squarely rejected the argument that parties' proposed financial orders constrain the trial court's discretion in fashioning its financial orders." See *Fitzsimons* v. *Fitzsimons*, 116 Conn. App. 449, 459, 975 A.2d 729 (2009) ("[w]e never have held that proposed orders serve to limit . . . the discretion of the trial court"). The plaintiff further argues that the court, pursuant to its broad equitable power in fashioning financial orders attendant to a martial dissolution proceeding, may award alimony to a party "even if that party does not seek it and has waived all claims for alimony."

In his reply brief, the defendant clarifies that he "is not arguing that the trial court must adopt the proposed orders of one party or the other," but rather argues that the court abused its discretion by entering an order "that effectively compelled [the defendant] to purchase [the plaintiff's] interest in the companies for $6,000,000" where both parties requested the sale of the companies in their proposed orders. The defendant argues that the cases relied upon by the plaintiff, including *Fitzsimons*

v. *Fitzsimons*, supra, 116 Conn. App. 449, and *Fiddel-man* v. *Redmon*, 37 Conn. App. 397, 656 A.2d 234 (1995), are distinguishable from the facts of the present case because the parties here agreed that the court should direct the sale of the companies. He further contends that "[where] the parties to a divorce action are in agreement as to the distribution of a particular marital asset . . . the trial court should not adjudicate an issue that is not in dispute and instead should distribute that asset in accordance with the requests made by the parties."

As noted in part I of this opinion, the court distributed the parties' marital property pursuant to § 46b-81. Nowhere does this statute limit the court's ability to award a marital asset to one of the parties in a dissolution proceeding, even if they both are in agreement regarding how the property be distributed. "We have often stated that the power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances that arise out of the dissolution of a marriage. . . . These equitable powers give the court the authority to consider all the circumstances that may be appropriate for a just and equitable resolution of the marital dispute." (Citation omitted; internal quotation marks omitted.) *Porter* v. *Porter*, 61 Conn. App. 791, 797, 769 A.2d 725 (2001). We cannot agree that the court here abused its discretion in rendering its initial financial orders with respect to the companies.

The judgment granting the motion to open is reversed and the case is remanded with direction to reinstate the May, 2012 financial orders. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Although these appeals have not been consolidated by this court, we write one opinion for purposes of judicial economy in which we assess the claims made in both appeals.

[2] Because we agree with the plaintiff as to her first claim and reverse the judgment of the court opening the judgment of dissolution, we have no occasion to reach the plaintiff's additional claims that the court improperly refused to apply the law governing causation and damages in a tort case, and improperly found that the plaintiff breached the parties' confidentiality agreement. Likewise, we need not reach the plaintiff's claim in the alternative that "even if the trial court had jurisdiction to open the May 2012 judgment based on postjudgment conduct, the judgment should be reversed because it is based on the testimony of an unqualified expert."

[3] Having determined that the court improperly opened the dissolution judgment, we decline to review the defendant's claim that the court was required, under the mosaic doctrine, to order a new trial on all financial issues after finding that the plaintiff's misconduct had significantly decreased the value of the companies.

[4] Sziklay chose the date of June 30, 2011 "to be as close as practicable to the date of the decree dissolving [the plaintiff's] marriage to [the defendant], in accordance with the standard of value required by the family court before which the subject dissolution action [was] adjudicated, and in accordance with conventional valuation theory and practices." The report authored by Sziklay, dated August 15, 2011, was entered into evidence by the plaintiff as a full exhibit on March 1, 2012.

[5] On May 13, 2010, during the pendente lite period, the parties agreed to advances against equity, also known as member distributions, from the companies. In accordance with the respective ownership interests of the parties, the plaintiff received $3,060,000 and the defendant received

$2,940,000 from the companies. Pursuant to the court ordered stipulation, these sums were deemed advances against equitable property distribution ordered by the court.

[6] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to take an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. If the case goes to judgment on appeal, any stay thereafter shall be in accordance with Section 71-6 (motions for reconsideration), Section 84-3 (petitions for certification by the Connecticut supreme court), and Section 71-7 (petitions for certiorari by the United States Supreme Court)."

[7] The execution of the court's order awarding the plaintiff periodic alimony was not stayed. Practice Book § 61-11 (c) provides in relevant part: "Unless otherwise ordered, no automatic stay shall apply . . . to orders of periodic alimony, support, custody or visitation in family matters brought pursuant to chapter 25 or to any later modification of such orders. The automatic orders set forth in Section 25-5 (b) (1), (2), (3), (5) and (7) shall remain in effect during any appeal period and, if an appeal is taken, until the final determination of the cause unless terminated, modified or amended further by order of a judicial authority upon motion of either party. . . ."

[8] We note that this was the second motion to open the judgment of dissolution that was filed by the defendant. Previously, on May 29, 2012, the defendant filed two motions: (1) a "motion to open and adduce additional evidence, postjudgment," and (2) a "motion to reargue, postjudgment." The court denied both motions on August 1, 2012.

[9] In rejecting the remedy of ordering a new trial, the court reasoned that "[t]he parties have had the ability to provide all their evidence at the original trial and in regard to the instant motion. This court has the ability to integrate all of the facts found in its consideration and their application to the law as it refashions its orders here. A new trial would be an unneeded expense and delay with neither necessity nor benefit seen."

[10] Subsequently, on March 5, 2014, the defendant filed a motion to reargue the court's substitute financial orders. The defendant argued that reargument was necessary because "the [court] awarded the [companies] to [the defendant] and ordered him to pay the plaintiff the sum of $3,000,000 notwithstanding its finding that the plaintiff's misconduct diminished the value of the [companies] by the sum of $5,678,680." On March 26, 2014, the court denied the defendant's motion to reargue.

[11] Practice Book § 17-4 (a) provides: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, any civil judgment or decree rendered in superior court may not be opened or set aside unless a motion to open or set aside is filed within four months succeeding the date on which notice was sent. The parties may waive the provisions of this subsection or otherwise submit to the jurisdiction of the court."

[12] We are not required to conclude that the court considered *only* the plaintiff's postjudgment conduct in opening the judgment.

[13] We address the postjudgment conduct of the plaintiff only in the context of the issues raised in this case. We do not address whether other remedies may exist for postjudgment conduct that may diminish the value of property.

[14] In *McRae*, this court rejected the defendant's claim that the trial court improperly awarded the plaintiff the cash equivalent of one-half of the value of a closely held business in addition to alimony as impermissible "double-dipping." *McRae* v. *McRae*, supra, 129 Conn. App. 187–88.